# WINONA & ST. PETER RAILROAD COMPANY v. BARNEY & Others.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE DISTRICT OF MINNESOTA.

Argued December 4, 5, 1884.—Decided March 2, 1885.

If acts granting public lands to a State to aid in constructing railroads contain words of description to which it would be difficult to give full effect if they were used in an instrument of private conveyance, the court in construing the acts will look to the condition of the country when they were passed, as well as to the purpose declared on their face, and will read all parts of them together.

By the act of March 3, 1857, Congress granted to the then Territory of Minnesota in aid of the construction of certain railroads certain alternate sections of lands along the lines of the roads, and further provided that "in case it shall appear that the United States have, when the lines or routes of said roads and branches are definitely fixed, sold any sections, or any parts

thereof, granted as aforesaid, or that the right of pre-emption has attached to the same, then it shall be lawful for any agent or agents, to be appointed by the governor of said Territory or future State, to select, subject to the approval of the Secretary of the Interior, from the lands of the United States . . . so much land . . . . as shall be equal to such lands as the United States have sold or otherwise appropriated, or to which the rights of preëmption have attached as aforesaid," &c.   *Held*, That the indemnity clause in this act covers losses from the grant by reason of sales and the attachment of preëmption rights previous to the date of the act, as well as by reason of sales and the attachment of preëmption rights between that date and the final determination of the route of the road.

*Railroad Co.* v. *Baldwin*, 103 U. S, 126, distinguished.

*Leavenworth Railroad Co.* v. *United States*, 92 U. S. 733, explained.

The act of March 3, 1865, 13 Stat. 526, enlarged the grant made to Minnesota by the act of March 3, 1857, from six sections per mile to ten sections; and the limits within which the indemnity lands were to be selected to twenty sections, and further provided, that "any lands which may have been granted to the Territory or State of Minnesota for the purpose of aiding in the construction of any railroad, which lands may be located within the limits of this extension of said grant or grants, shall be deducted from the full quantity of the lands hereby granted."   Prior to the act of 1865, a grant had been made to a railroad of lands located within the limits covered by said extension grant: *Held*, (1) That the grant by the act of 1857 was a grant of land in place, and not of quantity; (2) that the enlargement of the grant by the act of 1865 did not change its nature as to the six sections originally granted; (3) that as to the remaining four sections the grant was one of quantity, but to be selected along and opposite the completed road; (4) that where the earlier grant to aid in the construction of the Minnesota and Cedar Valley Railroad interferes with the extension grant to the plaintiff in error, the earlier grant takes the land, and the extension must be abandoned.

On the 3d of March, 1857, Congress passed an act, 11 Stat. 195, making a grant of lands to the Territory of Minnesota to aid in the construction of certain railroads, with their branches, and, among others, a railroad from Winona, a town on the Mississippi River, *via* St. Peter, to a point on the Big Sioux River, south of the 45th parallel of north latitude, which is in the present Territory of Dakota. The language of the act is, "That there be, and is hereby, granted to the Territory . . . every alternate section of land designated by odd numbers, for six sections in width on each side of each of said roads and branches; but in case it shall appear that the United States have, when the lines or routes of said roads and branches

are definitely fixed, sold any sections, or any parts thereof, granted as aforesaid, or that the right of preëmption has attached to the same, then it shall be lawful for any agent or agents, to be appointed by the governor of said Territory or future State, to select, subject to the approval of the Secretary of the Interior, from the lands of the United States nearest to the tiers of sections above specified, so much land, in alternate sections, or parts of sections, as shall be equal to such lands as the United States have sold or otherwise appropriated, or to which the rights of preëmption have attached as aforesaid; which lands (thus selected in lieu of those sold and to which preëmption rights have attached as aforesaid, together with the sections and parts of sections designated by odd numbers as aforesaid and appropriated as aforesaid) shall be held by the Territory or future State of Minnesota for the use and purpose aforesaid ; *Provided,* That the land to be so located shall, in no case, be further than fifteen miles from the lines of said roads or branches, and selected for and on account of each of said roads or branches."

On the 22d of May, of the same year, the legislature of the Territory of Minnesota passed an act to execute the trust created by the act of Congress, and, among other things, authorized a corporation previously formed—known as the Transit Railroad Company—to construct and operate the railroad mentioned, with one or more tracks, from Winona to the Big Sioux River, south of the 45th parallel of north latitude, on the most direct and feasible route, by way of St. Peter, and granted to the company, in order to aid in the construction of the road, the interest and estate, present and prospective, of the Territory and future State in the lands ceded by the act of Congress, together with the rights, privileges and immunities conferred by it. This grant was made with a proviso that the land should be exclusively applied to the construction of the road, and to no other purpose. The Transit Railroad Company subsequently mortgaged to the State the lands it had thus received, together with its franchises, in order to obtain aid to construct the road and comply with the conditions on which the aid was given. It, however, made default, and the mort-

gage was foreclosed, and the property and franchises of the
company were sold and bought in by the State. These pro-
ceedings took place before March 10, 1862.

The Territory of Minnesota became a State, and was admit-
ted into the Union in 1857, and on the 10th of March, 1862,
its legislature passed an act transferring to the Winona and St.
Peter Railroad Company, the defendant below, the lands,
property, franchises and privileges which the State had acquired
from the Transit Railroad Company. Soon afterwards the
defendant commenced the construction of the railroad, and
before March, 1865, completed it from Winona to Rochester,
a distance of forty-nine and a half miles.

By an act passed on the 3d of March, 1865, 13 Stat. 526, § 3,
Congress increased the quantity of land granted to Minnesota
by the act of 1857, to ten sections per mile for all of the roads
and branches, subject to the same limitations attached to the
original grant, and enlarged the limits within which indemnity
lands were to be selected to twenty miles from the line of the
roads. The third section provided "That any lands which
may have been granted to the Territory or State of Minnesota
for the purpose of aiding in the construction of any railroad,
which lands may be located within the limits of this extension
of said grant or grants, shall be deducted from the full quantity
of lands hereby granted, and that any lands which may have
been so granted shall be strictly applied in accordance with the
terms and conditions of said act or acts unless subsequently
modified by law." The sixth section provided that lands
granted by the act, or previously granted to the Territory or
State of Minnesota, " shall be disposed of by said State for the
purposes aforesaid only, and in manner following, namely:
When the governor of said State shall certify to the Secretary
of the Interior that any section of ten consecutive miles of said
road is completed in a good, substantial and workmanlike
manner, as a first-class railroad, and the said Secretary shall be
satisfied that said State has complied in good faith with this
requirement, the said Secretary of the Interior shall issue to the
said State patents for all the lands granted and selected as
aforesaid, not exceeding ten sections per mile, situated opposite

to and within a limit of twenty miles of the line of said section of road thus completed, extending along the whole length of said completed section of ten miles of road, and no further. And when the governor of said State shall certify to the Secretary of the Interior, and the Secretary shall be satisfied that another section of said road, ten consecutive miles in extent, connecting with the preceding section, or with some other first-class railroad which may be at the time in successful operation, is completed as aforesaid, the said Secretary of the Interior shall issue to the said State patents for all the lands granted and situated opposite to and within the limit of twenty miles of the line of said completed section of road or roads, and extending the length of said section, and no further, not exceeding ten sections of land per mile for all that part of said road thus completed under the provisions of this act and the act to which this is an amendment; and so, from time to time, until said roads and branches are completed."

After the passage of this act the railroad company proceeded with the construction of the road westerly from Rochester, and before October 31, 1867, completed it to Waseca, one hundred and two miles and $\frac{79}{100}$ of a mile from Winona. Of this distance, as already stated, forty-nine and one-half miles were constructed before March, 1865, and the remainder, viz., fifty-three miles and $\frac{29}{100}$ of a mile were constructed afterwards.

Lands had previously been granted to Minnesota for the construction of the Minnesota and Cedar Valley Railroad, and that road intersected the road of the defendant below between Rochester and Waseca. Its lands at the intersection were located within the limits of the extension made by the act of 1865 to the original grant of 1857.

On the 31st of October, 1867, the railroad company agreed with the plaintiffs, upon sufficient considerations, to convey to them as many acres of land, previously granted by Congress to Minnesota, as the company should receive from the State by reason of the construction already had of the portion of the Winona and St. Peter Railroad, estimated to be one hundred and five miles (but in fact only 102 miles $\frac{79}{100}$ of a mile), extending westward from Winona, which amounted, as was sup-

posed, to about six hundred thousand acres, and which were to be selected as follows :

" Beginning at Winona, and from thence proceeding on each side of said railroad on a course running parallel therewith, and embracing each of the six, ten, fifteen and twenty-mile limits of the Congressional land grants, and in proceeding taking all lands within each and all of said limits which shall be received by said company under said acts of Congress, or either of them, it being understood that on each side of said railroad a uniform line of advance westwardly, embracing all the lands in said limits, shall be maintained as nearly as may be until as many acres shall have been selected and taken as the said company shall have received for the construction of the portion of said railroad now completed, which is estimated to be one hundred and five miles thereof, extending northerly and westwardly from Winona as aforesaid ; it being understood that the said parties of the first part shall receive as many acres as shall be received by the party of the second part for the construction of said one hundred and five miles, or so much thereof as is now constructed, notwithstanding that under the acts of Congress the said lands are certified only upon the completion of sections of not less than ten miles of railroad, but reserving, excepting and deducting from the said numbers of acres all lands necessary for the track of said railroad, or the right of way, or depots or depot-grounds, or other purposes incidental to the operation of said railroad.   And the said party of the second part agrees to acquire the title of said lands as fast as it may be permitted to do under said acts of Congress, and to release and convey to the said parties of the first part, or to such person or persons, in such manner, and from time to time, as may be directed by the said parties of the first part, or their counsel, on the request of the said parties of the first part, or a majority of them."

The execution, validity and obligation of this contract are admitted.   The present suit was commenced to enforce its specific performance, and the only question between the parties is as to the quantity of land to be conveyed under it.   Before the suit was commenced the company had conveyed to the plain-

tiffs, in part performance of the contract, 317,094 acres and $\frac{72}{100}$ of an acre.

As to that part of the road which was constructed under the act of 1857 from Winona to Rochester, the court held that under the act of Congress, the legislation of the State, and the contract with the company, the plaintiffs were entitled to six full sections of land for each mile of the road, and that for any deficiencies existing when the route of the road was definitely fixed, arising from previous sales by the United States of portions of the land, or previous attachment of preëmption rights, whether such sales took place or preëmption rights attached before or after the passage of the act, equivalent lands were to be selected from the indemnity lands provided. And as to that part of the road which was constructed westerly from Rochester to Waseca after the passage of the act of 1865, the court held that the plaintiffs were entitled to ten full sections per mile without any deduction for the lands which were located at the intersection of defendant's road with the road of the Minnesota and Cedar Valley Railroad Company, and within the grant for the latter's construction; and as the result of these rulings the court decided that the plaintiffs were entitled to a conveyance of 197,111 acres and $\frac{93}{100}$ of an acre, and entered a decree accordingly. 6 Fed. Rep. 802. From this decree the defendant appealed to this court.

*Mr. Thomas Wilson* for appellant.

*Mr. Gordon E. Cole* for appellee.

Mr. Justice FIELD delivered the opinion of the court. He stated the facts in the foregoing language, and continued:

Two questions are presented for our consideration by the appeal in this case. The first relates to the deficiencies in the sections designated as granted in the act of 1857, arising from sales and the attachment of preëmption rights previous to the final determination of the route of the road of the railway company, and the extent to which indemnity for these deficiencies may be supplied from other lands. The second relates to the reser-

vation from the operation of the act of 1865 of lands previously granted to Minnesota to aid in the construction of any railroad, which were located within the limits of the extension made by that act to the original grant, and its effect on the amount of lands claimed by the plaintiffs.

The solution of these questions depends, of course, upon the construction given to the acts making the grants; and they are to receive such a construction as will carry out the intent of Congress, however difficult it might be to give full effect to the language used if the grants were by instruments of private conveyance. To ascertain that intent we must look to the condition of the country when the acts were passed, as well as to the purpose declared on their face, and read all parts of them together.

The act of 1857 grants lands to the State to aid the construction of several railroads. These were to be built through large districts of country sparsely settled. Though the termini of each were designated, it was impossible, in advance of surveys, to designate the specific route of any one, even approximately. In many instances, where the sections would fall along such route, sales of land had already been made by the United States, and preëmption rights of settlers had attached; and before the route would be definitely fixed by surveys and maps, many other sales of land falling within the sections would probably be made and other preëmption rights attach. It was not for the interest of the country that any portion of the public lands should be withheld from sale and settlement because, when the route of the roads was definitely determined, they might fall within the limits of the grants; nor was it the purpose of Congress to lessen the extent of its aid because it might ultimately be found that, at the time of its grant, or when the route was determined, portions of the land designated had already been disposed of or preëmption rights had attached to them. The policy of the government was to keep the public lands open at all times to sale and preëmption, and thus encourage the settlement of the country, and, at the same time, to advance such settlement by liberal donations to aid in the construction of railways. The acts of Congress, in effect,

said : " We give to the State certain lands to aid in the construction of railways lying along their respective routes, provided they are not already disposed of, or the rights of settlers under the laws of the United States have not already attached to them, or they may not be disposed of or such rights may not have attached when the routes are finally determined. If at that time it be found that of the lands designated any have been disposed of, or rights of settlers have attached to them, other equivalent lands may be selected in their place, within certain prescribed limits." The encouragement to settlement by aid for the construction of railways was not intended to interfere with the policy of encouraging such settlement by sales of the land, or the grant of preëmption rights. It follows that in our judgment the indemnity clause covers losses from the grant by reason of sales and the attachment of preëmption rights previous to the date of the act, as well as by reason of sales and the attachment of preëmption rights between that date and the final determination of the route of road.

It is to no purpose to say, against this construction, that the government could not grant what it did not own, and therefore could not have intended that its language should apply to lands which it had disposed of. As already said, the whole act must be read to reach the intention of the law-maker. It uses, indeed, words of grant, words which purport to convey what the grantor owns, and, of course, cannot operate upon lands with which the grantor had parted ; and therefore when it afterwards provides for indemnity for lost portions of the lands " granted as aforesaid," it means of the lands purporting to be covered by those terms. Nor is it to any purpose to cite decisions to the effect that the grant is *in præsenti*, passing an immediate interest to the State. Such is undoubtedly the case, except as the operation of the grant is affected by the limitations mentioned ; that is to say, when the sections granted are ascertained, the title to them takes effect as of the date of the grant, and cuts off all intervening claimants except as to such portions as may have been sold, or to which pre-emption rights may have attached.

The language in *Railroad Co.* v. *Baldwin*, 103 U. S. 426, does not militate against this construction of the act. It ex-

presses the general purpose of the reservation to keep the lands open at all times to settlement and preëmption, and subject to appropriation for public uses until the route of the road is determined, but does not declare that lands previously sold, or to which the rights of preëmption had previously attached, are excluded from the indemnity clause. The court was there drawing attention to the difference between the two grants in the act of Congress of July 23, 1866—that of sections of land and that of the right of way, the former being a present grant, except as its immediate operation was affected by the reservations, the latter being a present absolute grant without any reservation or exception.

The language in *Leavenworth, Lawrence, &c., Railroad Co.* v. *United States*, 92 U. S. 733, is quoted as sanctioning the position of the appellant. The court, speaking of the indemnity clause in the grant then under consideration, said its purpose was to give sections beyond the limit designated for those lost within it by the action of the government between the date of the grant and the location of the road. But it did not say that this was its only purpose; and, if the language must be construed as meaning that, it was a mere dictum, not essential to the decision of the case. The question was, what lands could be taken for indemnity, not for what deficiencies indemnity could be had. And it was held that an Indian reservation did not pass by the grant, and could not be taken as indemnity for the lands otherwise lost from it. There was no question before the court for what deficiencies indemnity could be supplied.

As to the effect of the reservation in the third section of the act of 1865, of lands previously granted to Minnesota, for the purpose of aiding in the construction of any railroad, there should be little doubt. The grant by the act of 1857 is one of description, that is, of land in place and not of quantity. It is of every alternate section, designated by odd numbers, for six sections on each side of the road, that is, of particular parcels of land lying within certain defined lateral limits to the road and described by numbers on the public surveys. And the indemnity clause provides for loss from those parcels by sales or the

attachment of preëmption rights before the route becomes definitely fixed—the indemnity lands to be selected within fifteen miles from the line of the road. The act of 1865 enlarges the quantity granted from six sections to ten, and the indemnity limits from fifteen miles to twenty. The character of the grant, so far as the six sections are concerned, is not thereby changed from one of lands in place, or by description, to one of quantity. The use of the terms " quantity of lands granted " in the first section, in referring to the amount granted by the act of 1857, is of no significance. It is the same thing as though the act had used the words "six sections " instead of the word quantity, and had said they should be increased to ten sections. The four sections are to be selected by the Secretary of the Interior beyond the six and within the twenty miles limit; and as to them the grant may be regarded as one of quantity, though the coterminous principle applies to them, and they are to be selected along and opposite the completed road.

The reservation of the lands previously granted to Minnesota from the grant of the additional four sections, that is, from the extension of the original grant of 1857, was only a legislative declaration of that which the law would have pronounced independently of it. Previous grants of the same property would necessarily be excluded from subsequent ones. The only embarrassment in the construction of the section arises from the inapt words used to describe the land from which the previous grant is to be deducted. The language of the section is "that any lands which may have been granted to the Territory or State of Minnesota for the purpose of aiding in the construction of any railroad, which lands may be located within the limits of this extension of such grant or grants, shall be deducted *from the full quantity of lands hereby granted.*" The only lands granted by the act of 1865 are the four sections for each mile additional to the original six, accompanied with a right to select indemnity lands within twenty miles of the road. The words, " the full quantity granted," only denote the entire extension. To the extent of the previous grant that extension must be reduced, even if the whole be taken. Those words do not transfer the loss from the ten sections within which the grant falls

to other sections along the line. The sections in which such grant falls are correspondingly reduced.

It follows that where the grant previously made to Minnesota to aid in the construction of the Minnesota and Cedar Valley Railroad interferes with the extension of the grant to the defendant by the act of 1865, the extension must be abandoned. The earlier grant takes the land which would otherwise be added to the original six sections. The court below therefore erred in holding that the Winona Company was entitled to ten full sections where such interference occurred, without deducting the lands previously granted to the State.

The cause must, therefore, go back that the proper deduction may be made by reason of this interference of the two grants, and the elder grant be deducted from the extension made by the act of 1865.

*Decree reversed, and cause remanded, with directions to take further proceedings in accordance with this opinion.*