UNITED STATES *v.* SIOUX CITY & ST. P. R. Co. *et al.*

(*Circuit Court, N. D. Iowa, W. D.* October Term, 1890.)

1. PUBLIC LANDS—RAILROAD AID GRANT.

Act Cong. May 12, 1864, granted to the state of Iowa, for the purpose of aiding in the construction of a railroad from Sioux City to the Minnesota state line, and from a point on such road to South McGregor, every alternate section of land for 10 miles from such roads not otherwise disposed of, with indemnity for such disposed-of land. The former road was built, except a part where all the granted land had been previously sold. *Held*, that said road was only entitled to such part of the grant as was proportioned to the part of the road that was built.

2. SAME.

Said road having been decreed to be entitled to only a moiety of the land included in the grant to both roads, it is entitled to indemnity for the moiety thus lost.

In Equity. Bill for adjustment of land grant.

*W. H. H. Miller*, Atty. Gen., *E. C. Hughes*, and *W. L. Joy*, for complainant.

*J. H. & C. M. Swan*, for defendants.

SHIRAS, J. The congress of the United States, by the act approved May 12, 1864, granted to the state of Iowa, for the purpose of aiding in the construction of a railroad from Sioux City to the south line of the state of Minnesota, to such point on said line as the state of Iowa might select, between the Big Sioux and the west fork of the Des Moines river, and also a line of railroad from South McGregor, in said state, running

westerly on or near the forty-third parallel of north latitude, to a point of intersection with the first-mentioned line in the county of O'Brien, every alternate section of land designated by odd numbers for 10 sections in width on each side of said roads, not sold, pre-empted, or otherwise disposed of by the United States, it being further provided that, for every section or part thereof sold or disposed of by the United States, within the 10-section limit, the secretary of the interior should select in lieu thereof, from the public lands of the United States nearest to the tiers of sections first described, and within 20 miles of the located line of railroad, and included in the alternate odd-numbered sections or parts thereof, such quantity as should be equal to the lands sold, reserved, or otherwise appropriated by the United States within the 10-section limit. The state of Iowa, by an act of its general assembly, accepted the grant thus made, and designated the Sioux City & St. Paul Railroad Company as the beneficiary of the grant, so far as the same provided for the building of a road from Sioux City to the Minnesota state line. That company accepted the grant, and on the 27th day of September, 1866, commenced the location of its line from Sioux City, completing the survey thereof to the Minnesota line by October 4, 1866; and on the 2d day of April, 1867, it caused to be filed in the office of the secretary of state of the state of Iowa a duly certified map of such location, and on the 10th day of July, 1867, this map, with the certificates of the governor and secretary of state of Iowa, was filed in the office of the secretary of the interior at Washington. On the 26th day of August, 1867, the commissioner of the general land-office of the United States transmitted to the local land-office at Sioux City a map showing the location of said line of railway, together with the 10 and 20 mile limits marked thereon, with an official letter withdrawing the lands numbered by odd sections from entry or sale, and increasing the price of the even-numbered sections to $2.50 per acre. In the year 1869 the railroad company made and filed in the land-office at Sioux City selections of all the lands undisposed of in the odd-numbered sections within the 10 and 20 mile limits, which selections amounted to 407,870 21-100 acres. In the year 1872 the company commenced the construction of the line of railway, beginning at the Minnesota state line, and progressing southwardly until the line reached the town of Le Mars, in Plymouth county. In the months of July and August, 1872, and November, 1873, the governor of Iowa filed with the secretary of the interior certificates showing the construction of 5 sections of 10 miles each of said railroad, and on the 16th day of October, 1872, and the 25th day of January, 1875, the secretary of the interior caused patents to issue to the state of Iowa for all the lands selected within the place and indemnity limits of said grant, covering 407,870 21-100 acres. The governor of Iowa, on behalf of the state, executed deeds to the railway company for 322,412 81-100 acres of these lands. In 1879, a suit in equity was brought in the United States circuit court for the district of Iowa, on behalf of the Chicago, Milwaukee & St. Paul Railway Company, as the successor of the McGregor & Western Railroad Company, which had become entitled to the lands granted for the build-

ing of the line from McGregor to the point of intersection with the Sioux City line, against the Sioux City & St. Paul Company, for the purpose of settling the rights of the respective companies to the lands embraced within the overlapping limits of the two grants, when the lines of railway approached each other. The supreme court of the United States held that the grant must be construed to be, within the overlapping limits, a grant in common, and that each company was entitled to one-half the lands; that the lands within the 10-mile limit of each road were to be equally divided, as well as the indemnity lands outside the 10 but within the 20 mile limits of both roads; but that neither company, in placing indemnity lands, could invade the 10-mile limit of the other company. *Sioux City & St. P. R. Co.* v. *Chicago, M. & St. P. Ry. Co.*, 117 U. S. 406, 6 Sup. Ct. Rep, 790. Based upon this ruling, a decree in partition was entered in the case, which had the effect of conveying to the Chicago, Milwaukee & St. Paul Company 41,687 52-100 acres of the land which had been previously deeded by the state of Iowa to the Sioux City & St. Paul Company. Deducting these, there remains of the lands deeded to the defendant company 280,725 29-100 acres, which it has sold or disposed of, and the title to which is not questioned. Of the 407,870 21–100 acres of selected lands conveyed to the state of Iowa in trust under the provisions of said grant, there remain undisposed of 800 acres in Dickinson county, and 21,179 85-100 acres in O'Brien county, which the state of Iowa refuses to convey to the railway company, claiming that the same has not been earned by the defendant company. The time limited in the act of congress of May 12, 1864, within which the state of Iowa was to cause the building of the lines of railway named in the act, has long since passed by, and no further rights to the lands under that grant can be hereafter acquired by any action on part of the state or the railroad company. The bill in the present cause was filed under the provisions of the act of congress of March 3, 1887, providing for the adjustment of land grants in aid of the construction of railways, and the forfeiture of unearned lands; and the issues presented require a construction of the grant in question in order to determine the lands to which the defendant company has become entitled. Counsel for the respective parties have very fully and ably discussed the questions involved, and have submitted to the court well-digested briefs of the points and the authorities relied upon. I shall not attempt to touch upon all the points and authorities thus presented, but shall confine myself to a statement of the conclusions reached upon the few general points which, as I conceive it, must control the rights of the parties.

In construing grants of the nature of the one now in question, the object sought to be accomplished must be ever borne in mind, for this is what the subsidiary provisions of the law are intended to accomplish. As is said by the supreme court in *Railroad Co.* v. *Barney*, 113 U. S. 618, 5 Sup. Ct. Rep. 606, these land grants "are to receive such a construction as will carry out the intent of congress, however difficult it might be to give full effect to the language used, if the grants were by instruments of private conveyance. To ascertain that intent, we must

look to the condition of the country when the acts were passed, as well as to the purpose declared on their face, and read all parts of them together." Can there be any doubt of the purpose which congress had in view when it passed the act making the grant in question? Was not such purpose to secure the construction of a line of railway from Sioux City to the Minnesota state line? This is the purpose declared upon the face of the act, as well as the one which all the other circumstances clearly indicate. To accomplish this purpose, congress was willing to grant all the public lands, not otherwise disposed of, found within the alternate sections designated by odd numbers within 10 miles of the located line of railway, with the right to select, within a limit of 20 miles from the odd-numbered sections, such quantity, if the same could be found not otherwise disposed of, as should equal the number of acres falling within the 10-mile limit excepted from the grant by reason of having been sold or otherwise disposed of by the United States. There is no guaranty by the United States that the quantity of land covered by the grant should equal any fixed number of acres, either for the construction of the entire road or any portion thereof. The extent of the grant and the limitations thereto are fixed by the terms of the act, but there is no attempt to state the number of acres that the grant would in fact cover, and the exceptions named in the act clearly show that it was expected that the company undertaking the construction of the line of proposed railway must be content with whatever quantity of land it was ultimately found was covered by the grant, and in fact conveyed by it. This quantity of lands, whatever the number of acres, the United States granted for the purpose of securing the building of a line of railway from Sioux City to the Minnesota state line, and the defendant company, when it accepted the grant, undertook to build that line, and not a part of it. To entitle the company to the entire quantity of lands covered by the grant, whether more or less, it was required to build the line of road named. Part performance on its part would not entitle it to demand entire performance on the part of the United States. The company, having failed to build the entire line, could not, equitably, demand payment for more than the number of miles actually constructed, and this much the United States is willing to concede the company may demand. The fact that, in the third paragraph of the act of congress, it is provided that, upon the completion of each section of 10 miles, the secretary of the interior should issue to the state of Iowa patents for 100 sections of land for the benefit of the company, cannot, when read in connection with the other sections of the act, be construed to mean that, by the building of 10 miles, the company absolutely earned the 100 sections. The work contracted to be done was an entirety, to-wit, the line from Sioux City to the southern boundary of Minnesota, and the compensation to be paid by the United States was the total number of acres of land covered by the grant, and the provisions of paragraph 3 only fix the time for partial payments to be made, and are not intended to change the clear meaning of the granting clause of the act. It must therefore be held that the company is entitled to such portion of the

lands actually covered by the grant as the number of miles of road actually constructed bears to the total length of the located line from Sioux City to the southern boundary of Minnesota. On behalf of the United States it is claimed that the company is limited in its selections for each 10-mile section of completed road to the lands found within the 10 and 20 section limits of each completed section. Whatever might be the limitation, when selecting the lands as each 10 miles was completed, I do not think any such restriction is applicable upon a final settlement of the rights of the parties. As I construe the grant, congress agreed to give, in consideration of the building the entire line of road, a quantity of land equal to the amount of the alternate sections within a limit of 10 sections on each side of the located line throughout its entire length, provided such quantity could be found within the 20-mile limit. The grant is not, so many acres for each mile, or each section of 10 miles, but so much for the entire line. If the contention of the United States in this particular is correct, it would follow that, if the company had built the line from Sioux City to Le Mars only, it could get nothing, as, in effect, there were no lands coterminous to that part of the line on which the grant could act. If the building of the line from Sioux City to Le Mars would not have earned any of the grant, for the reason stated, then the building thereof from Le Mars to the Minnesota line would earn all that the grant covers; and this is what is claimed by the company, and is resisted by the United States, when applied to the actual state of the case, which is, that the company, finding that the grant would not cover lands over the entire length of proposed road, built the road southwardly from the Minnesota line, going no further than the town of Le Mars. The conclusion reached on this point is that the right of selection extends over the entire length of the proposed road, and is not limited to the tiers of sections coterminous to the line of railway actually built.

This view practically disposes of the next point at issue between the parties, which is, whether the defendant company can make claim to indemnity for the moiety of lands which passed to the Chicago, Milwaukee & St. Paul Railway Company under the decision of the supreme court in the case already cited from 117 U. S. 406, 6 Sup. Ct. Rep. 790. On behalf of the United States it is argued that, as the two grants were made in one act, it must have been the intent to limit each company to a moiety thereof, and that by mere construction the grant should not be extended beyond the fair import of its language. The terms of the grant, however, are explicit, and embrace every alternate section along the entire length of the road within the 10-section limit, with the proviso that if, upon the definite location of the line, it was found that the United States had sold or permitted pre-emption or homestead rights to attach to any of these alternate sections, or that the same had been reserved by the United States for any purpose whatever, then indemnity lands should be selected in lieu thereof, within the 20-mile limit. Upon the location of defendant's line, it was found that a moiety of the alternate sections had been reserved by the United States for the purpose of aiding in the

construction of another line of railway, and, hence, to replace these lands, the defendant company could resort to the lands within the limits of the grant lying outside of those passing to the Chicago, Milwaukee & St. Paul Railway Company. If the grant to the McGregor line had been made by another act of congress, it could not be claimed that it did not reserve lands within the meaning of the exception found in the present act so as to entitle the defendant company to claim indemnity therefor, and the mere fact that the two grants are found in one act of congress, instead of in two, does not change the result in this particular. I hold, therefore, that the grant is not limited to one-half of the alternate sections found within the overlapping limits of the two grants, and that the defendant company is entitled to make claim for the proper portion of the lands that were reserved for the McGregor road, and which passed to the Chicago, Milwaukee & St. Paul Railway Company. As already stated, in the year 1867, the commissioner of the general land-office transmitted to the local land-office at Sioux City an official map showing the located line of the railway, and the 10 and 20 mile limits therefrom. In 1887, a succeeding commissioner of the general land-office prepared another map, which, to some extent, changes these limits, and the question is mooted which should be followed in adjusting the rights of the parties. It may be true, as claimed, that the later map is the more accurately drawn, but it not being claimed that the original map is in any way affected by fraud or serious mistake, I think it should govern in ascertaining the rights of the parties. It was made at the time it became necessary to define the limits in question. It presents or represents the view of the land department at that time, and must be held to have governed and controlled the local land-office and all third parties since its execution. It is impossible to now know how many titles and rights are based thereon, and it is always unwise to discredit, without good reason, documents which have been accepted and acted upon by the community at large. As an original proposition, under the express terms of the act, in selecting indemnity lands within the 20-mile limit, it was the duty of the secretary of the interior to make the selections from the tiers of sections nearest to the place limits; but if by any means other selections were in fact made and patented to the state, and by the state to the defendant company, that fact cannot be availed of by the defendant as a defense to the present bill for a proper and equitable adjustment of the rights of the parties. The defendant has no right to any of these lands, except as they may have been earned under the terms of the grant, and it cannot be heard to say that any of them were wrongly selected, so long as it claims them under the grant. The act of congress of March 3, 1887, on which this suit is based, makes it the duty of the department and of the courts, in dealing with this matter of the readjustment of these land grants, to carefully protect the rights and equities of actual settlers. Hence, the rule should be followed that in making such adjustment, so far as it may be possible to do so, actual settlers shall not be deprived of their farms or homes, even if, to do so, it may require the apportionment to the company of a section or other

quantity of land within the indemnity limits, which would not fall within the nearest tiers of sections. I have thus indicated the conclusions I have reached upon the general propositions discussed by counsel, but have not attempted to deal with the question of details. If, in the application of these rules to the special facts, counsel cannot agree as to the results, such differences must be hereafter presented; but I trust the foregoing opinion is sufficiently explicit to enable counsel to frame a proper decree thereunder.