**WESTERN NUCLEAR, INC., a Delaware Corporation, authorized and doing business in the State of Wyoming, Plaintiff,**

v.

**Cecil ANDRUS, Secretary of the United States Department of the Interior, and the United States of America, Defendants,**

**and**

**Wyoming Stock Growers Association, John Orr and the Associated General Contractors of Wyoming, Intervenors.**

**No. C78–129K.**

United States District Court, D. Wyoming.

Aug. 27, 1979.

---

Paul J. Hickey, of Horiskey, Bagley & Hickey, Cheyenne, Wyo., Harley W. Shaver and John H. Licht, of Canges & Shaver, Denver, Colo., and Terrence A. Kippen, of Western Nuclear, Inc., Denver, Colo., for plaintiff Western Nuclear, Inc.

Charles E. Graves, U. S. Atty., for the District of Wyoming, Sharon A. Lyman, Asst. U. S. Atty., for the District of Wyoming, Cheyenne, Wyo., and Lyle K. Rising, Dept. of Interior, Denver, Colo., for defendants.

Glenn Parker, of Hirst & Applegate, Cheyenne, Wyo., for intervenor Wyoming Stock Growers Association.

Marilyn S. Kite, Laramie, Wyo., for intervenors John Orr and the Associated General Contractors of Wyoming.

## MEMORANDUM OPINION

KERR, District Judge.

This case presents the question of whether gravel is a mineral. It is a dispute between Western Nuclear, a mining company, and the Interior Department (BLM) over the ownership of certain gravel deposits. The facts are not in dispute.

Western Nuclear has been located in Jeffrey City, Wyoming since the early 50's when uranium was first discovered on Green Mountain. Exploration in the area has been going on for more than 10 years. After Western Nuclear had done initial exploration and location of the ore bodies, it began sinking a shaft in September 1975.

To keep the sides of the shaft from caving in, the company has been using concrete to shore the shaft. To date, the shaft is about 1500 feet deep. Western Nuclear's contractor hauled gravel from Lander and Casper to use in the concrete that was mixed in Jeffrey City.

This method of concrete production was very expensive so Western Nuclear began looking for a local source of material. In March 1975 they had bought a piece of property (the subject land) from Johnson-Redland which had an old gravel pit located thereon.

The original conveyance of the subject land was by patent (# 914013) in 1926 pursuant to the Stock-Raising Homestead Act (1916). The patent contained the following reservation:

> Excepting and reserving however, to the United States all the coal and other minerals in the land so entered and patented together with the right to prospect for, mine, and remove the same pursuant to the provisions and limitations of the Act of December 29, 1916 . . . 39 STAT 862.

Western Nuclear has taken some 43,000 cubic yards of gravel from the site. The majority of it was used for blacktopping streets and pouring sidewalks in Jeffrey City.

Prior to removing the gravel, Western Nuclear made application to the Wyoming Department of Environmental Quality (DEQ) to obtain a permit for the development of a gravel pit.

The Wyoming DEQ informed the BLM of the pending application and granted the permit. When the permit was granted, Western Nuclear dug certain quantities of gravel from that pit. On November 3, 1975 Western Nuclear was served with a Notice of Trespass. The notice alleged a violation of the Materials Act of 1947 and the Common Varieties Act of 1955.

The finding of involuntary trespass by the Wyoming office of the BLM was appealed to the Interior Board of Land Appeals (IBLA). The decision of the Wyoming BLM was upheld in a May 22, 1978 decision, 35 IBLA 146.

Western Nuclear was assessed damages of approximately $13,000 for the gravel taken.

Plaintiff argues on review that (1) BLM and the Interior Department lack jurisdiction over the land in question. From a study of the cases, this argument lacks merit. (2) The mineral reservation did not include ordinary gravel. (3) The amount assessed as damages is inappropriate and not in conformance with Wyoming law. The BLM did not take into account the cost of recovering the gravel.

Issue: Does the Stock-Raising Homestead Act's reservation "all the coal and other minerals" include gravel?

■ Before the mineral reservation is examined more closely, the general rules of statutory construction must be considered: (1) Patent mineral reservations are construed according to the intent of Congress at the time of enactment and under the circumstances then present. *Moor v. County of Alameda*, 411 U.S. 693, 709, 93 S.Ct. 1785, 36 L.Ed.2d 596 (1973); *U. S. v. Stewart*, 311 U.S. 60, 69, 61 S.Ct. 102, 85 L.Ed. 40 (1940).

■ Legislative intent is sought in the history of the legislation as recorded in the legislative record, the committee report, statements by sponsors, floor debates, as well as the condition of the country at the time and the purpose of Congress. *Winona & St. Peter R. R. v. Barney*, 113 U.S. 618, 625, 5 S.Ct. 606, 28 L.Ed. 1109 (1885); *U. S. v. Union Pac. R. R. Co.*, 230 F.2d 690 (10th Cir. 1956), rev. on other grounds 353 U.S. 112, 77 S.Ct. 685, 1 L.Ed.2d 693 (1957).

■ (2) Public legislation is construed broadly in favor of the government which made the grant; no rights pass by implication. *U. S. v. Union Pac. R.R. Co.*, 353 U.S. 112, 77 S.Ct. 685 (1957); *Andrus v. Charlestone Stone Productions Co.*, 436 U.S. 604, 617, 98 S.Ct. 2002, 56 L.Ed.2d 570 (1978).

The Stock-Raising Homestead Act (SRHA) of Dec. 29, 1916, 43 U.S.C. §§ 291–301 (1970), was enacted to "restore and promote the livestock and meat-producing capacity of the semi-arid states and . . . to furnish homes to landless and homeless citizens of our country." Stock-Raising land was classified as "lands, the surface of which is . . . chiefly valuable for grazing and raising forage crops, do not contain merchantable timber, and not susceptible to irrigation from any known source of water supply, and are of such character that [640] acres are reasonably required for the support of a family." 43 U.S.C. § 292 (1970).

Following entry and compliance with the requirements of the statute, the entryman became entitled to a patent subject to a reservation in the U. S. of the "coal and other minerals". The SRHA provided that the reserved minerals would be disposed of under the coal and mineral land laws in effect at the time of disposal. The SRHA gives any qualified person the right "at all times" to enter onto patented surfaces to prospect for minerals. Under one statutory alternative, 43 U.S.C. 299, it is not necessary for the prospector to obtain the surface owner's consent, he can post a bond sufficient to cover the damage to permanent improvements. Otherwise, he obtains consent and pays for the actual damage to the permanent improvements. Congress subsequently expanded the Act of 1916 to include damages caused by a prospector's strip or open-pit mining to the value of the land for grazing by Act of June 21, 1949, 30 U.S.C. 54 (1970) and Act of June 17, 1949, 30 U.S.C. 54 (1970). Congress probably intended to encourage prospecting under this Act by omitting the surface owner's consent to such entries. 1 American Law of Mining Sec. 3.50.

Historically, the severance of the surface from the mineral estate can be traced to English Common Law by which the Crown retained the gold and silver from grants of the land. The Continental Congress in America followed suit by reserving a ⅛ interest in all gold, silver, lead and copper mined on the public lands opened to settlement under the Land Ordinance of 1785. This continued in a variety of forms until 1846 when the pre-emption and homestead acts allowed the minerals to pass with patents to the land. The settlement act attempted to exclude known mineral lands from agricultural entry and patent. Because of unscientific methods, classification of mineral land was a failure and vast tracts of mineral lands in the West had passed to private owners by 1900.

Congress would not act to prevent this loss so President Theodore Roosevelt became involved. He withdrew large areas of public land thought to be valuable for coal from all forms of entry. In 1906 and again in 1907, President Roosevelt pointed out that some public lands were useful for both agriculture and production of subsurface fuels, and that these two uses could best be served by separate disposition of the right to utilize the same land for each purpose. The President called the attention of Congress "to the importance of conserving the supplies of mineral fuels still belonging to the Government". 41 Cong.Rec. 2806 (1907). To that end, the President recommended "enactment of such legislation as would provide for title to and development of the surface land as separate and distinct from the right to the underlying mineral fuels in regions where these may occur . . . ."

In 1909 the Secretary of the Interior returned to the same theme, arguing that "inducements for much of the crime and fraud . . . can be prevented by separating the right to mine from the title to the soil. The surface would thereby be open to entry under other laws according to its character and subject to the right to extract coal . . . ." The Secretary made the same suggestion with respect to "oil and gas fields in the public domain".

The Coal Lands Act of 1909 and 1910 were the first two of the agricultural entry statutes. These were followed by the Agricultural Entry Act of 1914 which allowed agricultural entry onto lands withdrawn as valuable for phosphate, nitrate, potash, oil, gas or asphaltic minerals. In order to provide more acreage to ranchers in the arid Western lands, the Stock-Raising Homestead Act (SRHA) of 1916 was also adopted. It increased the homestead allotment from 320 acres to 640 acres. It eliminated the problem of classifying lands entered under its provisions as agricultural or mineral. The 1916 Act simply provided for a qualified patent which reserved to the U. S. all minerals in lands homesteaded for stock-raising purposes.

The effectiveness of these Acts was ended by the Taylor Grazing Act of 1934, which ended homesteading on the public domain. Uncontrolled grazing had been seriously damaging the public range.

The immensity of the problem resulting from separation of estates is apparent in the amount of surface acreage affected. As of 1972, entries under the SRHA affected 70,362,406 acres of land. (BLM, U. S. Department of Interior, Public Land Statistics 58 [1972]). In Wyoming, approximately 12% of the state is subject to federal reservations of minerals under private lands, most under the SRHA.

The reports of the committee and the floor debates on the SRHA reveal that the intent of Congress was to follow the recommendations of the President and the Secretary of the Interior, that is to sever the two estates.

The House report states:

It appeared to your committee that many hundreds of thousands of acres of the lands of the character designated under this bill contain coal and other minerals, the surface of which is valuable for stock-raising purposes. The purpose of (the reservation) is to limit the operation of this bill strictly to the surface of the lands described and to reserve to the United States the ownership and right to dispose of all minerals underlying the surface thereof. The section also provides a method for the joint use of the surface of the land by the entryman of the surface thereof and the person who shall acquire from the United States the right to prospect, enter, acquire and remove all minerals that may underlie such lands, this method to be under the direction of the Secretary of the Interior under such rules and regulations as he may prescribe. H.R.Rep.No.35, 64th Cong., 1st Sess. 18 (1916)

The comments of the Interior Department were included in the report of the House Committee on the Public Lands:

"The farmer-stockman is not seeking and does not desire the minerals, his experience and efforts being in the line of stock raising and farming, which operations can be carried on without being materially interfered with by the reservation of minerals and the prospecting for and removal of same from the land." Ibid, 5.

In floor debates, various representatives emphasized that the grant was limited to the surface estate and all minerals were retained by the United States:

"We believe it would cover every kind of mineral. All kinds of minerals are reserved." Congressman Ferris, manager of the bill, 53 Cong.Rec. 1171 (1916).

Congressman Mondell opposed the SRHA's general mineral reservation because it restricted the patentee's estate more than earlier statutes and stated for the Congressional Record:

". . . The fact should be emphasized that the bill establishes a new method and theory with regard to minerals in the land legislation in our country. It reverts back to the ancient doctrine of the ownership of the mineral by the King or the Crown and reserves specifically everything that is mineral in all land entered. It was, it was claimed, necessary to accept a provision of that kind in order to secure the larger acreage . . . My own opinion is that the policy is not wise and that in the long run it will be found to be infinitely more harmful than beneficial or useful or helpful to anyone, either the individual or the public generally. When one takes into consideration the wide range of substances classed as mineral, the actual ownership under a complete mineral reservation becomes a doubtful question." 54 Cong.Rec. 687 (1916).

At the time of enactment, the term mineral did not have a definite meaning. Several contemporaneous authorities on mining law and minerals had the following definitions of the term. Lindley on Mines, Sec. 98, (1914 rev. ed.), lays down certain rules for determining the mineral or nonmineral character of lands as follows:

The mineral character of land is established when shown to have upon it, or within it, such a substance as (a) is recognized as mineral according to its chemical composition by the standard authorities on the subject; or (b) is classified as a mineral product in trade or commerce; or (c) such a substance (other than the mere

surface which may be used for agricultural purposes) as possesses economic value for use in trade, manufacture, the sciences or the mechanical or ornamental arts.

And it is demonstrated that such substance exists therein or thereon in such quantities as render the land more valuable for the purpose of removing and marketing the substance than for any other purpose, and the removing and marketing of which will yield a profit; or it is established that such substance exists in the lands in such quantities as would justify a prudent man in expending labor and capital in the effort to obtain it.

The above definition was cited with approval in an early 8th Circuit decision by Judge Kenyon, *Dunbar Lime Co. v. Utah-Idaho Sugar Co.*, 17 F.2d 351 (1926).

Lindley further stated:

The real test [of what is a mineral] seems to be the character of the deposit as occurring independently of the mere soil, valuable in itself for commercial purposes, that is near enough to a market to have a value. Sec. 93.

Lindley cited English and American authorities for the proposition that gravel is a mineral. He added that according to the great weight of authority limestone and gravel type deposits would not be considered as reserved in a deed excepting "minerals", if they constituted the land or a principal part of it. But in the same treatise, Sec. 424, he strongly criticized the Land Department's decision of 1910, *Zimmerman v. Brunson,* infra, relied on by plaintiff herein, ruling that gravel was not a mineral. Lindley states:

A similar disagreement exists between the courts and the land department as to sand and gravel . . . The courts follow a consistent uniformly recognized principle which establishes the test of profit marketability. The Land Department follows this principle as a general rule, but disregards it in the case of common place substances such as ordinary clay, sand and gravel. We submit deferentially that the common place quality of

a substance is not sufficient warrant for departing from the general rule.

Another authority defined "mineral" as: ". . . any constituent of the earth's crust, more especially an inorganic body, occurring in nature, homogeneous and having a definite chemical formula, and having certain distinguishing characteristics and which is capable of being got from the earth for the purpose of profit." Ricketts on Mines, Sec. 99 (1911).

Gravel is not capable of being expressed by one chemical formula because it does not have one definite chemical composition.

Congress, in enacting the SRHA, relied on administrative expertise and probably was cognizant of the decisions of the Interior Department.

Under the earliest decisions of the Land Department, it appears that gypsum, limestone, marble, alluvial deposits, gravelly soil and granite were considered as minerals within the purview of the Mining Act of 1872. W. H. Hooper, 1 L.D. 560 (1881); H. P. Bennet, Jr., 3 L.D. 116 (1884). But the Land Department also denied some claims that were based on stone deposits useful for building purposes only. *Conlin v. Kelly*, 12 L.D. 1 (1891). It would recognize claims founded on stone deposits that could be used for special purposes, monuments, ornamentation, etc.

The Interior decision on the subject, in force at the time of the enactment of the SRHA, was the case of *Zimmerman v. Brunson*, 39 L.D. 310 (1910). The Interior Department ruled that deposits of gravel and sand suitable for mixing with cement for concrete construction, but having no special value, do not make the land where they are found mineral land as defined by the mining laws. This is true notwithstanding that the land may be more valuable because of those deposits than for agricultural purposes. The Secretary's decision was that the sand and gravel were not minerals where (1) sand and gravel were not recognized by standard authorities as minerals; (2) the sole use of the materials was for general building purposes; and (3)

the chief value of the gravel was its proximity to a city.

In 1929 the decision in *Layman v. Ellis*, 52 L.D. 714, specifically overruled *Zimmerman* and ruled that gravel was a mineral locatable under the mineral laws. The Assistant Secretary cited the increased value of gravel from 1909 to 1929 and concluded by stating that "There can be no question that gravel deposits are definitely classified as a mineral product in trade and commerce and have a pronounced and widespread economic value because of the demand therefor in trade, manufacture, or in the mechanical arts", p. 718.

The Secretary said that (1) gravel is definitely classified as a mineral product in trade or commerce. (See T.D. 25627, 8 Treas.Dec. 356 (1904), "Gravel is certainly a mineral substance in the ordinary meaning of the term 'mineral' . . ."); (2) whether a given substance is locatable is not resolved solely by the chemical composition test; and (3) while the distinguishing special characteristics are purely physical, small bulk, rounded surfaces, hardness, these characteristics render gravel readily distinguishable from other rocks and rock fragments.

*Layman v. Ellis* was reaffirmed in a 1933 opinion of the Acting Solicitor, "Taking of Sand and Gravel from Public Lands for Federal Aid Highways", 54 L.D. 294.

The decision in the present case, Western Nuclear, 35 IBLA 146 (1978), relied on the next Interior Department case in the subject area, *U. S. v. Isbell Construction Co.*, 4 IBLA 205 (1971). In this case, the Interior Department was called upon to decide (1) whether common sand and gravel are "minerals" reserved to the U. S. in a patent granted under the Taylor Grazing Act, 43 U.S.C. Sec. 315g (1970) and (2) whether deposits of sand and gravel which comprise all or substantially all of the lands conveyed and are indistinguishable from the soil itself are within the ambit of the reservation.

The sand and gravel in this case comprised practically all of the surface and subsurface to depths of 20 to 600 feet. The surface estate had been patented to the State of Arizona with a reservation of "all the minerals" to the United States.

The IBLA collected the many state cases, which hold that grantors cannot be deemed to have reserved those minerals which comprise the surface, without clear and express language of reservation. The Board also noted that valuable deposits of sand and gravel had for many years been regarded as minerals subject to location under the mining laws and held the Multiple Surface Use Act of 1955 did not affect the mineral character of such materials.

The Board distinguished the above cases because the Taylor Act required compensation to the surface owner for damage to the land. The Board therefore held that a reservation of minerals to the United States reserved valuable deposits of common sand and gravel.

It allowed no exception to this rule where those minerals comprise all or substantially all of the land in question. They followed the majority rule of construction of mineral reservation by holding that the reservation should be construed as severing the mineral estate from the surface estate. This rule of construction would sever from the surface all mineral substances which can be taken from the soil and have separate value. Since there is the damage provision, the Board saw no reason to impose an exception for the protection of the surface owner.

It should be noted at this point that the BLM has never followed these decisions with consistency. It appears that it was not until 1975 that the Wyoming State office of the BLM attempted to be paid for the removal of gravel from patented surface estates. Until that time, it was the practice of the Wyoming Highway Department, construction companies, and the ranchers owning the surface estate to treat the gravel as part of the surface estate, the gravel being sold or used by the rancher with the approval of the BLM.

Before considering the court decisions in this area, it is important to analyze the significance of the Materials Act of 1955, 30 U.S.C. 611 (1970). Essentially, this act stat-

ed that "common varieties" of sand, stone, gravel, pumice, pumicite, and cinders are not to be deemed "a valuable mineral deposit within the mining laws of the United States so as to give effective validity to any mining claim hereafter located . . ." It provided for a new method of disposal for these common varieties. It must be emphasized that this does not legislatively end the dispute over gravel as a mineral since reserved minerals are not necessarily the same as locatable minerals.

This subject has created difficulty for the courts considering it. There is no clear consensus in the courts on the question of gravel as a mineral.

Most state court cases on the subject have construed private mineral reservations rather than U. S. mineral reservations. These cases vary but in the main hold that a mineral reservation would not include sand or gravel if it comprised the surface, unless there was a specific intent to do so. (95 ALR2d 843 [1964]).

The most recent state court decision on the subject addressed the precise question now under consideration. It was decided by the New Mexico Supreme Court, *New Mexico v. Trujillo*, 82 N.M. 694, 487 P.2d 122 (1971), which held that the reservation under the SRHA did not reserve gravel which had no rare or exceptional character. This court declined to follow the 10th Circuit analysis of the effect of the SRHA's mineral reservation, that is a severance of the two estates. *Skeen v. Lynch*, 48 F.2d 1044 (10th Cir. 1931). Also, the state court considered gravel to be more akin to soil and thus part of the surface estate rather than part of the mineral estate.

Decisions in the federal district courts are not many but they also vary in their treatment of the subject.

Two Alaskan cases were decided in the 1950's. The first was *Anchorage Sand & Gravel Co. v. Schubert*, 14 Alaska 403, 114 F.Supp. 436 (1953), which held that sand and gravel were not "valuable mineral deposits" under the mining laws of the United States. This case was affirmed on other grounds by the 9th Circuit. *Superior Sand*

*& Gravel Mining Co. v. Territory of Alaska*, 15 Alaska 640, 224 F.2d 623 (1955). In *U. S. v. Schaub*, 17 Alaska 672, 163 F.Supp. 875 (1958), the court held that the deposits of sand and gravel supported a mineral entry.

In a recent decision by the United States District Court, *Amoco v. Guild Trust* (Wyo. 1978), this court followed the analysis of the 10th Circuit in *Skeen v. Lynch,* supra, stating that the railroad mineral reservation, "coal and other materials", severed from the surface estate the mineral estate.

The U. S. Supreme Court has not considered the subject matter since 1903. In *Northern Pacific Railway v. Soderberg*, 188 U.S. 526, 23 S.Ct. 365, 47 L.Ed. 575 (1903), the court considered whether lands chiefly valuable for granite quarries were mineral lands under the Railway Act of 1869. The court ruled that these lands were mineral lands. Beginning at p. 530, 23 S.Ct. at pp. 367–69, the court stated:

> The word "mineral" is used in so many senses, dependent upon the context, that the ordinary definitions of the dictionary throw but little light upon its signification in a given case. Thus the scientific division of all matter into the animal, vegetable, or mineral kingdom would be absurd as applied to a grant of lands, since all lands belong to the mineral kingdom . . . In construing this grant we must not overlook the general principle announced in many cases in this Court, that grants for the sovereign should receive a strict construction—a construction which shall support the claim of the government rather than that of the individual. The rulings of the Land Department to which we are to look for the contemporaneous construction of these statutes, have been subject to very little fluctuation, and almost uniformly . . . have lent strong support to the theory of the patentee, that the words "valuable mineral deposits" should be construed as including all lands chiefly valuable for other than agricultural purposes, and particularly as including nonmetallic substances, among which are held to be alum, asphaltum, borax, guano,

diamonds, gypsum, resin, marble, mica, slate, amber, petroleum, limestone, building stone and coal . . . the overwhelming weight of authority to the effect that mineral lands include not merely metalliferous lands, but all such as are chiefly valuable for their deposits of a mineral character which are useful in the arts or valuable for purposes of manufacture. (This list was quoted with approval by the 8th Circuit, Judge Sanborn, in *Webb v. American Asphaltum Mining Co.*, 157 Fed. 203, 205 [1907]).

The determinative cases have been decided by the U. S. Courts of Appeal. In *Skeen v. Lynch*, 48 F.2d 1044 (10th Cir. 1931), Justice Lewis determined the interpretation of the mineral reservation in the Stock-Raising Homestead Act. The court ruled that "The legislative history of the Stock-Raising Homestead Act when it was reported for passage . . . leaves us no room to doubt that it was the purpose of Congress in the use of the phrase 'all coal and other minerals' to segregate the two estates, the surface for stock raising and agricultural purposes from the mineral estate and to grant the former to entrymen and to reserve all of the latter to the United States."

This court refused to use the rule of ejusdem generis, "of the same kind or species", in interpreting the mineral reservation. In *Bumpus v. U. S.*, 325 F.2d 264 (10th Cir. 1963), Judge Phillips used this rule of construction to decide the ownership of gravel under a Federal Declaration of Taking which reserved "all oil, gas and other minerals" to subsurface estate holders.

The court stated that ". . . 'mineral' is a word of general language and not per se a term of art. It does not have a definite meaning. It is used in many senses. It is not capable of a definition of universal application, but is susceptible to limitation or expansion according to the intention with which it is used in the particular instrument or statute . . . The word, if broadly construed, would include gravel."

The court then went on to hold that under the ejusdem generis rule of construction, the terms "oil and gas" limited the content of the word "minerals" to only those minerals "like" oil and gas. Therefore, gravel was not included.

In *U. S. v. Harris*, 115 F.2d 343 (5th Cir. 1940), the court ruled that gravel was a mineral. In *Cumberland Mineral Co. v. U. S.*, 513 F.2d 1399 (1975), the Court of Claims ruled that a private reservation of oil and gas and other minerals did not reserve clay and shale because the loss of the surface estate would result and would therefore be unreasonable.

The most recent case from the Court of Appeals interpreting the SRHA is that of *U. S. v. Union Oil Co.*, 549 F.2d 1271 (9th Cir. 1977).

The issue before the court was whether the mineral reservation in the SRHA reserves to the United States the geothermal resources under the patented lands. Following an exhaustive analysis of the legislative intent, the court concluded:

The Act's background, language and legislative history offer convincing evidence that Congress' general purpose was to transfer to private ownership tracts of semi-arid public land capable of being developed by homesteaders into self-sufficient agricultural units engaged in stock raising and forage farming, but to retain subsurface resources, particularly mineral fuels, in public ownership and conservation and subsequent orderly disposition in the public interest. p. 1274.

■ As stated earlier, the rule of construction to be applied in construing United States government mineral reservations is to decide in favor of the government if there is a question. The legislative intent is clear and has been determined by the 9th and 10th Circuits to be an intent to sever the surface estate from the mineral estate.

The cases cited illustrate that the term "mineral" does not have a closed, precise meaning. As a substance is found to be valuable, it has been included in the general mineral reservation of the government. (Oil, gas, helium, geothermal steam). This is despite the fact that at the time of the enactment of the Act the term "mineral" may not have included these particular substances.

The intent of the SRHA was to sever the two estates, the surface for stock raising and the mineral estate for mineral development. The mineral estate is a flexible entity which expands with the development of the arts and sciences to include more minerals. This is especially evident in the *Union Oil* case, supra, where what is essentially heated water has been ruled to be part of the mineral estate reserved in the SRHA of 1916. And, as the 9th Circuit noted, this was at a time when the use of geothermal steam as a fuel source was not widely thought of.

In conclusion, it is evident from the legislative history, contemporaneous definitions and court decisions that the mineral reservation in the SRHA of 1916 is broad enough to include gravel as a mineral. As such, the Court holds that gravel is reserved to the United States.

An Order will be entered affirming the decision of the Interior Board of Land Appeals.