## FIRST NAT. BANK OF PORT ARTHUR v. CITY OF PORT ARTHUR et al.
### No. 2089.

Court of Civil Appeals of Texas. Beaumont.
Feb. 12, 17, 1931.

Joe W. Williams, of Port Arthur, F. J. & C. F. Duff, of Beaumont, and James V. Allred, Atty. Gen., amicus curiæ, by E. L. Looney, Asst. Atty. Gen., for appellants.

R. A. Shivers, of Port Arthur, Orgain, Carroll & Bell, of Beaumont, W. P. Dumas, of Dallas, for appellee.

HIGHTOWER, C. J.

The appellant, the First National Bank of Port Arthur, Tex., hereinafter referred to as the bank, prosecutes this appeal from a judgment of one of the district courts of Jefferson county, awarding to the appellees, the city of Port Arthur and the Central Construction Company, a writ of mandamus directing and compelling the bank to honor and pay a check drawn by the city of Port Arthur in favor of the Central Construction Company for the sum of $12,056.58. This check was drawn by the city of Port Arthur against funds that had been placed in the bank as the city's depository and treasury, and was to pay the Central Construction Company for work done by that company in the construction of what is known and called the Stilwell Storm Drain in the city of Port Arthur. The bank refused to honor and pay the check for the reason, as claimed by it, that the city of Port Arthur was not authorized to expend any part of the fund on which the check was drawn in payment for the character of work that the Central Construction Company had performed for the city in connection with the Stilwell Storm Drain. There being no question of pleading involved as the case is presented to this court, no useful purpose would be served by a minute or detailed statement of the pleadings of the parties. As regards the pleading of the relators in the lower court, it will suffice to say that the allegations of their petition made a case entitling them to the relief sought and which was granted, provided the city of Port Arthur was authorized to expend any portion of the fund against which the check in favor of the Central Construction Company was drawn in payment for the work done by that company for the city of Port Arthur on the Stilwell Storm Drain.

The bank, respondent below, answered by a plea in abatement, general demurrer, and a number of special exceptions, all of which were overruled, and that ruling is not complained of here. The bank further answered by general denial, and then specially averred that the fund against which the check in question was drawn was not subject to its payment for the reason that the city of Port Arthur had no authority under the Constitution and law of this state to expend any part of that fund in payment for the work done by the Central Construction Company on the Stilwell Storm Drain. The facts upon which the bank bases this contention were minutely and fully stated in its answer, but it is unnecessary to repeat them here. The material facts that give rise to this controversy are either admitted by the parties or stand undisputed in the record.

The city of Port Arthur is situated on the coast of the Gulf of Mexico in Jefferson county, Tex., and being so situated, is authorized to vote and issue bonds for the purpose of providing means to construct and maintain sea walls and breakwaters, as provided by section 7, article 11, of the Constitution of Texas.

The Forty-First Legislature of the State of Texas, at its Regular Session (chapter 292), passed an act donating to the city of Port Arthur for a period of twenty years, if necessary, eight-ninths of the state ad valorem taxes in commissioners' precinct No. 2 of Jefferson county, Tex., in which the city of Port Arthur is situated, for the purpose of aiding the city of Port Arthur in paying the interest and sinking fund upon an issue of bonds, "The proceeds of which bonds are to be used exclusively in constructing, maintaining sea walls, breakwaters and shore protections in order that said city be protected from calamitous overflows and storm waters. The use and diversion of such monies for any other purpose whatsoever is hereby prohibited." Section 5. The act further provides for the collection of these taxes by the tax collector of Jefferson county, and directs that official to turn them over to the city treasurer of the

city of Port Arthur, Tex. It further provides, by section 1 thereof, that the donation of the taxes shall be for a period of twenty years commencing with the fiscal year beginning September 1, 1929. Section 5 of the act has this further provision:

" * * * That when the sinking fund created under the provisions of this Act shall become sufficient to retire all bonds issued hereunder, this Act shall cease to be operative and the donation herein made shall cease."

Section 5 of the act has this further provision:

" * * * Violation of the provisions of this Section shall constitute a misapplication of public money and the person or persons so offending shall be punished as provided for in Article 86 of the Penal Code of the State of Texas."

It is admitted by appellant, and conclusively shown by the record in this case, that the city of Port Arthur, by proper resolutions, ordinances, and vote of its citizens, was authorized to issue its bonds in the sum of $2,-000,000 "for the purpose of constructing and maintaining a seawall, breakwaters, and shore protection, in order to protect the City of Port Arthur, Jefferson County, Texas, from calamitous overflows."

The undisputed evidence discloses that the city of Port Arthur did duly and legally issue $1,700,000 worth of these bonds, which were duly and legally approved, and they were regularly and legally sold and the proceeds thereof placed and deposited in the First National Bank of Port Arthur, Tex., as the city's legally designated and qualified depository and treasurer. This bond fund is kept by the bank as a separate fund, and the city's check in favor of the Central Construction Company here in question was drawn on this fund.

The city of Port Arthur, according to the undisputed facts, has never levied or collected any tax to take care of the interest or sinking fund of these bonds, but has, up to the present time, relied on the taxes donated by the state for this purpose, and it seems that it is contemplated that this state tax will in the future be sufficient to take care of these items.

The record shows that the city of Port Arthur, at the time of the commencement of this proceeding and for some time prior thereto, had been constructing a sea wall around the city, the plans and specifications of which had been prepared by competent engineers employed by the city for that purpose, and the work was being done under the supervision, direction, and control of these engineers. A great portion of the sea wall contemplated by the city, under the plans and specifications of its engineers, had been done at the time of the filing of this suit, and it is contemplated that the construction of the sea wall will be continued and completed under the supervision and direction of these engineers.

The record discloses that the Stilwell Storm Drain above mentioned connects at right angles with a portion of the sea wall now completed and that this drain or ditch is about 2,000 feet in length. This drain, or ditch, was cut, or dug, about fourteen years ago, and the work that the Central Construction Company did on this drain, and which it is contemplated the company will continue to do, was to place concrete walls in this drain constituting it a concrete conduit, and then the conduit is to be covered with dirt. At the point where this drain connects with the sea wall, pumps have been installed and attached by the city under the supervision and direction of its engineers for the purpose of pumping the water out of this storm drain and over and outside of the sea wall, when necessary.

The brief filed by counsel for the appellant bank in this case presents sixteen propositions under which it is contended the judgment of the trial court must be reversed and here rendered in its favor. The first five propositions are grouped and presented together, since they relate to and raise the same legal proposition. The substance of appellant's contention made by these several propositions is that the city of Port Arthur was and is prohibited by section 8, article 11, of the Constitution of Texas from expending any portion of the bond fund in question in payment for the work done on the Stilwell Storm Drain by the Central Construction Company for the reason that the Stilwell Storm Drain is neither a sea wall nor a breakwater, as those terms are used in the Constitution, but that on the contrary the Stilwell Storm Drain was shown by the undisputed evidence to be only a part of the drainage system of the city of Port Arthur, and it contends that under the Constitution, section 8, article 11, as well as under the act of the Legislature hereinbefore referred to, the city of Port Arthur could not lawfully expend the fund against which the check in question was drawn. Since a disposition of this contention must control and dispose of this appeal, we shall not discuss or mention other propositions advanced by appellant.

Just before this cause was reached for submission in this court, the Honorable James V. Allred, Attorney General of the State of Texas, requested and was granted permission to file a brief as amicus curiæ on behalf of the state of Texas, and he did so. In this brief the Attorney General advances the same contention as is made by the appellant bank under its first five propositions. Therefore, our disposition of appellant's contention will have the effect to dispose of the contention made by the Attorney General.

In other words, counsel for appellant and the Attorney General make the contention that the language employed in section 8 of

article 11 of the Constitution is so plain and unmistakable that it is not subject to judicial construction, and that the Legislature could not grant state aid to any Gulf Coast city or county under that section for any purpose other than the construction of sea walls and breakwaters, as those terms are ordinarily understood. To be more precise, they contend that no structure or work of any character that is not actually a part of the sea wall proper, that is, the physical structure itself, or the breakwater proper, can be paid for with money furnished by the state.

Counsel for appellant and the Attorney General in this connection direct our attention to the definition of the term "sea wall," as given by the New Century Dictionary, volume 4, page 411. As there defined, a sea wall is:

"A cliff by the sea, a wall formed by the sea; a strong wall or embankment on the shore designed to prevent encroachment of the sea to form a breakwater. An embankment of stone thrown up by the waves on a shore."

According to the same authority, volume 1, page 671, a breakwater is:

"Any structure or contrivance as a mold, mound, wall, or sunken hulk, serving to break the force of the waves and protect a harbor or anything exposed to the force of the waves."

If it be true, as contended by counsel for appellant and the Attorney General, that this court should adopt these definitions and apply them strictly in arriving at the meaning of the framers of the Constitution when they drafted section 8, article 11, it perhaps would result in a reversal and rendition of this judgment. But we decline to be governed by these definitions of the lexicographer in arriving at the intention of the framers of the constitutional provision now in question, because to do so would, we think, be giving to that constitutional provision a construction entirely too narrow and such as was not intended.

The counter proposition advanced by counsel for appellees in answer to the contention of appellant, as we have just stated it, is as follows:

"The object and purpose of section 8, article 11, of the Constitution being to protect counties and cities bordering on the Gulf Coast against calamitous overflows, it will be construed in a broad way so as to accomplish its purpose, and the undisputed facts showing that the storm sewer being constructed for which the bond money in question is being spent is a component part of the seawall protection project of the City of Port Arthur and made necessary by the construction of the seawall proper, the court would not err in holding that the expenditures involved were not in violation of said article of the Constitution."

If the facts assumed in this counter proposition are true, which must be determined from the evidence in the record, we are of the opinion that the proposition itself is sound and must be sustained.

We find in the record the testimony of three civil engineers. One of these engineers is the witness J. B. Converse. Another is the witness B. F. Williams, and the third is the witness J. C. McVea. All of these witnesses were shown to be men of many years of experience in their line of work and their qualifications are not questioned in any respect. We shall not undertake to quote the testimony of these witnesses touching the relation of the Stilwell Storm Drain to the sea wall proper, that is, the physical structure of the wall itself, but will state the substance of this evidence only. It is clear from the testimony of these engineers that it is their opinion that the sea wall proper cannot adequately function as a sea wall by giving protection to the city of Port Arthur without the aid that the Stilwell Storm Drain or some other similar structure will afford. It is true that all of these engineers testified that the sea wall itself, that is, the physical structure itself, would stand and resist the force of wind and waves and the effect thereof to a certain extent without the assistance of this storm drain, but it is equally clear from the testimony of these engineers that this Stilwell Storm Drain, located as it is and attached to the sea wall as it is, will not only be of great benefit to the city of Port Arthur in the ordinary drainage work of the city, but that this drain is also essential and necessary in the case of gulf hurricanes which are always accompanied by heavy rainfalls. In other words, the testimony of these engineers is to the effect that even as to gulf waters that come over the sea wall during the raging of gulf hurricanes the Stilwell Storm Drain is necessary and essential to take care of that character of flood water and remove it as quickly as possible over the seawall for the protection of the city. It is true that the Stilwell Storm Drain or ditch, as it was then called, had been in existence a number of years before the sea wall construction was commenced, but now the city contemplates improving this ditch, or drain, by doing the concrete work on it, as we have already stated, to make it as efficient as possible to remove storm waters, both gulf and rainfall, from the city of Port Arthur. Counsel for appellant and the Attorney General admit that the fact that the ditch was dug before the construction of the sea wall and was in use by the city as a part of its drainage protection is of no material consideration in this case. The material point is as to whether this Stilwell Storm Drain when completed, as is contemplated it shall be, will afford essential and necessary aid to the sea wall proper in getting rid of storm waters that come over the seawalls during gulf hurricanes. If the Stilwell Storm Drain will have this effect

and afford this aid and assistance in connection with the sea wall proper, then it is our opinion that the Stilwell Storm Drain is and must be considered a part of the sea wall itself, as the term sea wall is used in section 8, article 11, of the Constitution, and, if this is correct, there can be no doubt upon the facts in this record that the trial court's judgment awarding the writ of mandamus was correct.

We are wholly unable to agree with learned counsel for appellant and the able Attorney General that no character of structure or work used in connection with a sea wall but which is not actually a part of the' sea wall itself can be paid for by state money because prohibited by section 8, article 11, of the Constitution. The framers of that article did not undertake to direct what material should be used in the construction of sea walls and breakwaters, nor did they attempt to direct, expressly or by implication, what the plans and specifications of sea walls and breakwaters should be. Indeed, the language of the framers there was very general, and it is probable that few, if any, of them had any knowledge of sea wall or breakwater construction work or as to the materials out of which they should be constructed. These matters necessarily were left to men competent in that line of work, such as the engineers who testified in this case. What the framers of the Constitution had in mind was the protection, as far as could be given, to cities and counties situated on the Gulf Coast in Texas, and by reason of their situation exposed to great hazards of the sea. It is but reasonable to presume that the framers of the Constitution knew that different structures in the way of sea walls and breakwaters would be used in different counties and cities bordering on the Gulf Coast by reason of the fact that the natural locations of such counties and cities would be different, the general topography of the country would be different, the elevation of these different counties and cities above sea level would be different, and that a character of structure or work that might be suitable and sufficient for the protection of one of these counties or cities would be wholly inadequate and insufficient for the protection of another differently situated and located in the respects above mentioned, and it ought to be presumed, we think, the framers of the Constitution contemplated that Gulf Coast cities and counties would engage the services of competent engineers in the construction of sea walls and breakwaters when deemed necessary for their protection and that they would be governed by the advice, skill, and judgment of such engineers as to the character, kind, and extent of the structures that would be erected or constructed. Now this record shows without dispute, as we have already intimated, that all of the engineers who testified in this case agree that the sea wall contemplated by the city of Port Arthur, and which is largely already constructed, must have, as a part thereof and in connection therewith, such a character of construction as the Stilwell Storm Drain in order that the wall itself may function in giving protection to the lives and property of the people of the city, which was the uppermost thought in the minds of the constitutional framers when section 8 of article 11 was framed.

Now let us see what the exact words of section 8, article 11, of the Constitution are:

"The counties and cities of the gulf coast being subject to calamitous overflows, and a very large proportion of the general revenue being derived from those otherwise prosperous localities, the legislature is especially authorized to aid by donation of such portion of the public domain as may be deemed proper, and in such mode as may be provided by law, the construction of seawalls or breakwaters, such aid to be proportioned to the extent and value of the works constructed, or to be constructed, in any locality."

■ Counsel for appellees, in their brief, call our attention to a number of general rules of construction pertaining to constitutional provisions. One of these rules is that referred to by our Supreme Court in Walker v. Meyers, 114 Tex. 225, 266 S. W. 499. The general rule there referred to is that contemporaneous and practical construction of constitutional provisions by the Legislature in the enactment of laws should have great weight and give rise to a natural presumption that the legislative construction rightly interprets the meaning of the provision. In connection with this general rule, counsel for appellee in their brief direct our attention to the several acts at different times of the Texas Legislature granting aid to Gulf Coast cities under section 8, article 11, of the Constitution. One of these is the act granting aid to the city of Galveston shortly after the destructive gulf hurricane in 1900. Another is the act granting aid to the city of Corpus Christi; another is the act granting aid to the city of Freeport; another is the act granting aid to the city of Rockport; another is the act granting aid to the city of Port Lavaca; another is the act granting aid to the city of Aransas Pass. In this connection counsel contend, and undertake to sustain the contention, that the Legislature in each of the instances above stated gave a broad and liberal construction to section 8 of article 11 of the Constitution and that the Legislature in those instances did not construe that section to limit state aid to Gulf Coast cities for the construction of sea walls and breakwaters, that is, to those physical structures themselves, but construed section 8 in a broad way so as to give aid to those Gulf Coast cities in the construction of works not actually a part of a sea wall or breakwater. We shall not dwell upon this suggestion of coun-

sel, though we are impressed with the force of this suggestion and the argument in connection. Other general rules of interpretation and construction may be said to be the following:

■ 1. The intention of the makers of the Constitution will be ascertained, and when that intention is so ascertained, whether expressed in plain language or not, such intent becomes as much a part of the law as if it had been expressed in plain and unequivocal terms. This was the rule announced by our Supreme Court in Mills County v. Lampasas County, 90 Tex. 606, 40 S. W. 403.

■ 2. Legislation, organic or statutory, must be reasonably construed and in a manner not repugnant to common sense. This rule is announced in Queen Insurance Co. v. State, 86 Tex. 250, 24 S. W. 397, 22 L. R. A. 483, and in St. Louis S. W. Railway Co. of Texas v. Tod, 94 Tex. 632, 64 S. W. 778.

■ 3. A public grant for a public advantage should be liberally construed in an endeavor to accomplish the purpose of the grant. This rule was announced in Aransas County v. Coleman-Fulton Pasture Co., 108 Tex. 216, 191 S. W. 553.

■ 4. In construing a law it will be presumed that the creators of same are familiar with the conditions to be relieved against and the condition of the county to which the act is applicable. Winona & St. P. R. Co. v. Barney, 113 U. S. 625, 5 S. Ct. 606, 28 L. Ed. 1109.

■ 5. If possible, that construction will be adopted which will promote the public interests in accord with sound economic policy. This rule was referred to in State v. De Gress, 72 Tex. 242, 11 S. W. 1029.

■ 6. In the construction of Constitutions, as well as statutes, the powers necessary to the exercise of power clearly granted will be implied. This rule was referred to in Texas Cent. R. Co. v. Bowman, 97 Tex. 417, 79 S. W. 295.

■ 7. Where a general power is conferred, every particular power necessary for the exercise of same is also conferred, whether expressly granted or not. This is the rule laid down in Cooley's Constitutional Limitations (8th Ed.) vol. 1, page 138.

■ In addition to the above general rules of interpretation, we think that the rule announced by our Supreme Court, through Chief Justice Phillips, in Aransas County et al. v. Coleman-Fulton Pasture Company, 108 Tex. 216, 191 S. W. 553, 554, where section 52 of article 3 of our Constitution was under construction, is the rule of greatest application to the facts in this case. It is as follows:

"The spirit, purpose and scope of the particular provision are all to be consulted in the effort to determine with certainty the meaning of its terms."

Applying that rule in this case, we have no hesitancy in concluding that the expenditure by the city of Port Arthur of its bond money above mentioned for the work done by the Central Construction Company in constructing the Stilwell Storm Drain was not prohibited and would not be in violation of section 8, article 11, of the Constitution. The spirit and the purpose that actuated the framers of that article was mainly the protection of the lives and property of people in cities situated on the Gulf Coast and always exposed to danger and hazards of the sea. Protection to those people and their property, we say, was the main and controlling thought, and in addition to that, and as incidental to that, was the benefit that would redound and accrue to the people of the whole state of Texas by protecting such of its citizens as live in the exposed cities. It was known that many Texas counties and cities were so situated upon the Gulf Coast as to be constantly exposed to the ravages and destruction of gulf hurricanes, and the purpose of the framers of the article was to give protection, as far as possible through human skill and agency, to the lives and property of our citizens exposed to such hazards.

We think that the trial court, under the evidence in this case, was correct in finding and concluding that the construction of the Stilwell Storm Drain, as contemplated, was an essential and necessary and component part of the sea wall project at Port Arthur, and that therefore the Stilwell Storm Drain when completed will be a part of the sea wall in the sense in which that term is used in section 8, article 11, of the Constitution.

From these conclusions it follows that the judgment of the trial court should be affirmed, and such is our order.

All parties agreed to abide judgment, and at their request mandate has this day (February 17, 1931) been issued.