**MARTIN K. EBY CONSTRUCTION CO., Inc., Appellant,**

v.

**Sandra Lee NEELY, by her legal representative and guardian, Cecile V. Neely, Appellee.**

**No. 7795.**

United States Court of Appeals
Tenth Circuit.

April 26, 1965.

---

John C. Mott, of McComb, Zarlengo & Mott, Denver, Colo., for appellant.

Kenneth M. Kripke, of Kripke & Friedman, Denver, Colo., for appellee.

Before PICKETT, HILL and SETH, Circuit Judges.

PICKETT, Circuit Judge.

This is a diversity action brought by the Guardian of Sandra Lee Neely, a minor, to recover damages from Martin K. Eby Construction Company, Inc. for the alleged wrongful death of her father, Gary Lee Neely. It was alleged that Neely's death was proximately caused by Eby's negligence in the construction, maintenance and supervision of a scaffold, or platform, located in a missile silo

being constructed near Elizabeth, Colorado, for the United States. Eby admitted the death of Neely but denied that it was negligent or that its acts were the proximate cause of Neely's death.

The case was tried to a jury. At the close of plaintiff's evidence and again at the close of all of the evidence, defendant moved for a directed verdict in its favor, alleging, among other things, that there was no evidence of negligence on its part, that there was no evidence tending to show that anything it did, or failed to do, proximately caused Neely's death, and that there was no evidence that it breached any duty owing to Neely. Both motions were overruled and the case submitted to the jury, which returned a verdict in favor of plaintiff in the sum of $25,000. Thereafter defendant filed a motion for judgment notwithstanding the verdict in accordance with its motions for directed verdict or, in the alternative, for a new trial. The trial court denied the motions and entered judgment on the verdict in favor of plaintiff. The dispositive question presented here is whether the plaintiff's evidence was sufficient to go to the jury on the issue of negligence and proximate cause.

The missile silo in question was being constructed and equipped by several different contractors. It is a cylindrical structure approximately 50 feet in diameter and 130 to 140 feet in depth. For construction purposes, it was divided into four Quadrants as follows: Quadrant I—the southeast one-fourth of the silo; Quadrant II—the northeast one-fourth; Quadrant III—the northwest one-fourth; and Quadrant IV—the southwest one-fourth. A square steel framework, called a "crib" is located inside the silo and it forms the frame within which the launcher rides up and down. Outside of the crib are two counterweights. These counterweights are between the crib and the silo's outer wall. One of them is located in each of Quadrants II and III, or the northeast and northwest portions of the silo. The counterweights are of an odd shape so as to conform with and fit between the straight side of the steel crib and the rounded outer wall of the silo, and slide up and down, as the launcher moves, within a system of fixed rigid rails. The launcher system is an elevator mounted within vertical rails, by which the missile is raised from its underground storage position to its firing position. Its movements are controlled and stabilized by the counterweights which go down as the launcher rises, and vice versa. The scaffolding and platforms required during the course of construction were furnished and built by Eby as a subcontractor on the project. Neely's employer was also a subcontractor, whose contract provided that it would furnish the engineering services and also the work done by the millwrights and other craftsmen who were employed by yet another contractor. Construction on the site was almost completed at the time Neely fell to his death from a platform which had been built near the top of the silo by employees of Eby. There remained to be done only the testing of the launcher system and the installation of the missile itself.

Sometime prior to the testing, Eby's carpenters had constructed a wooden platform between the counterweights which was to be used by those engaged in making the tests. The day silo captain, or millwright foreman, Blanchard, discovered that it was too large and interfered with the measurements that had to be taken from a drive locking mechanism at the bottom of the silo and the counterweight locking mechanism located about 6 feet below the top of the silo. He decided that the platform would have to be modified, and directed Eby's foreman to make the necessary changes so that the measurements could be made without interference from it. The platform was about two feet above the counterweights and after the changes had been made it did not cover the entire space between the counterweights. After the modifications had been made, Blanchard told the millwrights that they could begin making the critical measurements. At about the time the measurements were to be made, Blanchard ob-

served his fellow employee, Neely, who was the night silo captain standing on the platform. He asked Neely how things were going and Neely replied "everything is under control." Blanchard also testified that when he left the area it was well lighted, that he could see the counterweights and the platform as well as the space between them, and that the platform was on the level requested by him in his directions to Eby's foreman. The evidence is clear that the platform, both before and after the modification or reconstruction, was located in the same place. It extended in a north-south direction from the steel crib to the outer wall of the silo, and was supported on the south end by I-beams which were a permanent part of the steel crib. The north end rested on water pipes which were permanently fixed along the outer silo wall. The platform was between the two counterweights so that, facing north from the center of the silo, the one in Quadrant II was east and the one in Quadrant III was west of it. The platform was not more than two feet above the counterweights, on a vertical plane because of the fixed positions of the I-beams and water pipes, and it was one or two feet away from each counterweight, on a horizontal plane. There was a railing on the platform that commenced about 3 feet from the steel crib and ran along the Quadrant II, or east side, and continued along the end next to the outer wall. There was no railing along the Quadrant III, or west side, of the platform.

In addition to Neely, there were three other men engaged in making the measurements. It was Neely's duty to record the measurements when made by the others. To make the measurements, it was necessary that the four men be on top of the counterweight. Each of them stepped, or jumped, from the platform to the counterweight in Quadrant III, and completed the measurements there. Wilhoit, one of the four men, testified that he then proceeded from that counterweight to the platform, walked across it, stepped on the steel crib through the opening left in the rail there, walked along the steel crib, and then jumped over onto the top of the Quadrant II counterweight. His testimony as to what happened next is as follows: "I took hold of the cables that is coming into the counterweight with my right hand. I turned for a minute to see if my buddy and Mr. Neely were coming over at that time to help with this one, if they were ready. Just as I turned, I saw Mr. Neely coming across the scaffolding, and I didn't keep an eye right on him at the time. I just looked to see if they were coming. I took my safety belt and snapped it around, which it has a cable on it, snapped it around the cables and snapped it on my other side. Just as I did that, I just happened to glance up and saw Mr. Neely coming head first by the counterweight. With my left hand I made a grab and grabbed the back of his shirt. With a sudden jerk his shirt flipped out of my hand and he proceeded down." Wilhoit was the only witness who saw Neely fall. The other two workmen who were present were not called to testify, and there was no other evidence of the cause of the accident.

A trial court in this circuit has the duty to direct a verdict "where the evidence is without dispute or is conflicting but of such a conclusive nature that if a verdict were returned for the plaintiff or defendant, as the case may be, the exercise of sound judicial discretion would require that it be set aside." Mutual Life Ins. Co. of New York v. Bohlman, 10 Cir., 328 F.2d 289, 295, and cases cited therein. Auto Transports, Inc. v. Hinman, 10 Cir., 332 F.2d 553; United States v. Oklahoma City Retailers Ass'n, 10 Cir., 331 F.2d 328. We think the motion for a directed verdict in favor of Eby should have been granted.

Viewing the evidence in the light most favorable to the plaintiff, it establishes only that on the day in question Eby's employees were directed to modify a platform or scaffolding so that it would not interfere with certain critical measurements that had to be made within

the silo;[1] and that Eby's employees made the necessary changes. Neely and three other men began to take the measurements and had completed those on the Quadrant III counterweight; as they were moving over to take the measurements of the Quadrant II counterweight, Neely was observed coming across the platform, and the next thing that is known is that he was falling into the silo. There is no evidence of the cause of Neely's fall. The uncontradicted evidence does show that the platform did not break, that the railing did not break, and that there were no grease spots on the platform upon which he might have slipped. In short, the most that the evidence establishes is that Neely was on a platform constructed by Eby's employees at the time he fell.

█ . It is a fundamental rule of law that the burden is upon the one asserting negligence to prove it by a preponderance of the evidence, and such burden is not sustained by evidence that is surmise, speculation or conjecture. Letts v. Iwig, (Colo.1963), 384 P.2d 726; Perry Lumber Co. v. Ruybal, 133 Colo. 502, 297 P.2d 531; Gordon v. Clotsworthy, 127 Colo. 377, 257 P.2d 410, 49 A.L.R.2d 314; Coakley v. Hayes, 121 Colo. 303, 215 P.2d 901. The burden is not met in Colorado by the showing of the mere happening of an accident or the occurrence of an injury. Remley v. Newton, 147 Colo. 401, 364 P.2d 581; Drake v. Lerner Shops of Colo. Inc., 145 Colo. 1, 357 P.2d 624; Perry Lumber Co. v. Ruybal, supra.

█ It is, of course, the rule that negligence may be established by the facts and circumstances surrounding the accident or injury. Remley v. Newton, supra. In reliance upon this rule, appellee points out that the platform, as reconstructed, did not extend to the counterweights, but was one or two feet from the edges, and contained a railing along most of the east side and the north end. Appellee also points out that under the testimony, Neely could only get to the Quadrant II counterweight either by climbing over the railing or by going along the route taken by Wilhoit. It argues that from these circumstances the jury could infer negligence in that the platform was too small and the railing should not have been there. However, there is no evidence from which it could be inferred that the size of the platform caused Neely to fall. Nor is there any evidence to show that the railing was unnecessary or that it should not have been placed there. However, assuming for the sake of argument that the jury could by inference find negligence on the part of Eby in that the platform was too small and the railing unnecessary, it by no means follows that appellee is entitled to recover upon such proof. Under Colorado law, proof of negligence alone is not sufficient to impose liability. There must also be proof that the negligence was the proximate cause of the injury. Perry Lumber Co. v. Ruybal, supra; Maloney v. Jussel, 125 Colo. 125, 241 P.2d 862; Clark v. Wallace, 51 Colo. 437, 118 P. 973; Kent Mfg. Co. v. Zimmerman, 48 Colo. 388, 110 P. 187. Proximate cause is that which in natural and continued sequence, unbroken by any efficient, intervening cause, produced the result complained of and without which that result would not have occurred. Hook v. Lakeside Park Co., 142 Colo. 277, 351 P.2d 261, 86 A.L.R.2d 339; Stout v. Denver Park & Amusement Co., 87 Colo. 294, 287 P. 650; Town of Lyons v. Watt, 43 Colo. 238, 95 P. 949. In Mosko v. Walton, 144 Colo. 602, 358 P.2d 49, 52, the Colorado Supreme Court stated the rule as follows:

"Their negligent act or omission must have been such that without it the injury would not have occurred. * * * The rule of proximate cause requires proof that but for the defendants' negligence the damage would not have occurred. * * * Where the evidence as here, presents no more than an equal choice of probabilities, it is not substantial.

1. The measurements required the use of a plumb bob which could not be made without a narrowing of the platform.

* * * 'No number of mere possibilities will establish a probability'. * * * "

Proximate cause is ordinarily a question of fact for the jury, but where the facts are undisputed, it becomes a question of law for the court. Stout v. Denver Park & Amusement Co., supra; Clark v. Wallace, supra. In this case, the undisputed facts show a total lack of competent evidence to connect the fall by Neely with the alleged negligence on Eby's part. There is no adequate showing of a causal connection between the alleged smallness of the platform or the location of the railing or the lack of additional railings, and Neely's fall. It may, of course, be conceded that the platform might possibly have had something to do with his fall, but there is nothing in the record to show what it was.

We conclude that the record wholly fails to disclose sufficient evidence to establish either negligence on Eby's part or, assuming such negligence, that it was the proximate cause of Neely's death.

Reversed, with instructions to dismiss the action.