Joseph **SCHENFELD**, Appellant,

v.

**NORTON COMPANY**, Appellee.

No. 9386.

United States Court of Appeals
Tenth Circuit.

March 25, 1968.

Rehearing Denied July 2, 1968.

Philip Hornbein, Jr., Denver, Colo. (Roy O. Goldin, Denver, Colo., was with him on brief), for appellant.

John C. Mott, Denver, Colo. (of Zarlengo, Mott & Carlin, Denver, Colo.), for appellee.

Before MURRAH, Chief Judge, and BARROW and DELEHANT*, District Judges.

MURRAH, Chief Judge.

Appellant Joseph Schenfeld was injured in the course of his employment with Western Foundries, Inc., when a grinding wheel he was using flew into pieces, one or more of which struck him in the face. The wheel was mounted on a power grinder by means of a metal mount. Schenfeld brought suit against appellee Norton Company (the manufacturer and supplier of both the grinding wheel and metal mount), alleging: (1) breach of an implied warranty that the grinding wheel was in all respects fit, proper and safe to be used when mounted in the manner in which it was, and (2) negligence. At the close of the evidence the trial judge sustained Norton's motion to dismiss the implied warranty claim. He found that the metal mount was not sold by Norton to Schenfeld's employer, and concluded that in the absence of a "sale", there could be no implied warranty. The case was submitted to the jury on the negligence count, the court instructing on both negligence and contributory negligence. Judgment was entered on the jury verdict in favor of Norton. On appeal, Schenfeld contends that the trial judge erred in: (1) instructing the jury on contributory negligence, and (2) dismissing the implied warranty claim.

The record discloses the following pertinent facts. Norton manufactures and markets approximately 250,000 varieties of grinding wheels. The type being used by Schenfeld at the time of the accident was a so-called "raised hub" grinding wheel, designed to perform a particular grinding operation. Norton markets, as a separate item, a fiber mount to be used for mounting raised hub wheels. For some time prior to the accident Western Foundries' Foreman Grieve had purchased hub grinding wheels and fiber mounts from Danielson, Norton's salesman who made monthly visits to the foundry. Grieve became dissatisfied with the fiber mounts because they wore down too quickly and, about a month before Schenfeld's injury, asked Danielson if there was a metal mount that could be used in place of the fiber one. Danielson replied that although Norton did not make a metal mount for sale as a separate item, it did market, as a complete unit, a metal mount and grinding wheel attached together by means of a cement adhesive. This unit was called a "dis-card mount wheel" or a "throw-away mount wheel" because the mount was discarded along with the wheel when the wheel was worn out. Danielson said he would get Grieve one or two of these metal dis-card mounts which, after removal from the attached grinding wheels, could be used in place of the fiber mounts. A few days later Danielson brought two of the throw-away mounts to Western Foundries and told Grieve "to give these a try and see if they would work." [1]

On the morning of the accident, Grieve personally mounted a hub wheel (admittedly manufactured and marketed by Norton) on a portable grinder by means of one of the supplied metal mounts. He subsequently assigned the grinder to Schenfeld to remove rough places from a cast iron irrigation gate. Schenfeld testified that after checking the grinding wheel for chips, he started the grinder and had "barely touched" the gate with the grinding wheel when the accident occurred.

The trial of the case was essentially a battle of experts. In support of his negligence and breach of warranty counts, Schenfeld presented expert testimony to the effect that there was a mismatch between the metal mount supplied by Danielson and the grinding wheel;

---

* By special designation.

1. The metal mounts appeared to be in used rather than new condition, and the evidence is in dispute as to whether Danielson or Grieve removed the attached grinding wheels from the metal mounts.

that this mis-match created a gap between the mount and the wheel; and that when the two were placed on the grinder and tightened, a stress was created in the grinding wheel, causing it to break and injure Schenfeld. This conclusion as to the cause of the accident was refuted by two expert witnesses called by Norton. Based upon their examination of the wheel fragments, they concluded that the grinding wheel broke as the result of being "jammed" by the operator, i. e. banged suddenly into the work piece.

At the close of the evidence, the trial judge, over objection by Schenfeld's counsel, instructed the jury to return a verdict for Norton if the jury found that Schenfeld was guilty of contributory negligence. On appeal, Schenfeld argues that the expert testimony to the effect that the accident was caused by jamming on the part of Schenfeld was merely "surmise, speculation and conjecture", and did not form a sufficient basis upon which to predicate an instruction on contributory negligence. On the contrary, we think the instruction was proper.

■ It is true of course that contributory negligence, like primary negligence, must be based upon something more than speculation or surmise, but negligence, either primary or contributory, may be established by reasonable inferences drawn from the facts and circumstances surrounding the accident. See Martin K. Eby Construction Co. v. Neely, 10 Cir., 344 F.2d 482; McCready v. United Iron and Steel Co., 10 Cir., 272 F.2d 700; and Remley v. Newton, 147 Colo. 401, 364 P.2d 581. Norton's experts examined the wheel fragments as they existed immediately following the accident, and listened to Schenfeld's description of the manner in which he was holding the grinder when the accident occurred. From the information thus gathered, they concluded that the accident resulted from "jamming" on the part of the

operator. We think the opinion they formed and expressed was permissible under the facts and circumstances, and warranted an instruction on contributory negligence.

■■ Before considering the propriety of the trial judge's dismissal of Schenfeld's implied warranty claim, it seems appropriate to quickly review the development and present status of the various potential recovery routes open to a claimant injured by a defective product. One such avenue of redress is, of course, an action for negligence. Since MacPherson v. Buick Motor Co., 217 N.Y. 382, 111 N.E. 1050, it is no longer doubted that the supplier of a chattel negligently made is liable for foreseeable harm to anyone injured, regardless of privity. See Prosser, The Assault Upon the Citadel (Strict Liability to the Consumer), 69 Yale L.J. 1099, 1100–1103 (1960).

■ Independently of the negligence route, recovery has been traditionally allowed for breach of an express or implied warranty. Such a warranty was considered to be a part of the contract between the seller and buyer and thus had its basis in contract law. See Dagley v. Armstrong Rubber Co., 7 Cir., 344 F.2d 245. With the advent of the Uniform Sales Act, now replaced in the vast majority of states by the Uniform Commercial Code, recovery became conditioned upon compliance with its pertinent warranty provisions. USA §§ 12 and 15. Recovery was often precluded, however, by the assertion of certain recognized contractual defenses such as lack of privity or the existence of a disclaimer. See Annot., 75 A.L.R.2d 39, 47–54. In response to a felt need, many courts circumvented these defenses by using theories of fictitious agency or third party beneficiary.[2] The theory which has become more or less agreed upon in later years is that of a "warranty" running with the goods or made directly to the

---

**2.** E. g., Wisdom v. Morris Hdw. Co., 151 Wash. 86, 274 P. 1050; Ward Baking Co. v. Trizzino, 270 Ohio App. 475, 161 N.E. 557. See also Prosser, The Assault Upon the Citadel (Strict Liability to the Consumer), 69 Yale L.J. 1099, 1124–1126 (1960).

consumer on the basis of public policy.[3] The net effect of these cases was to impose on the manufacturer strict liability, i. e., liability in the absence of either negligence or privity. This strict liability was first imposed in breach of warranty cases involving food and drink[4], and was gradually extended to include articles for intimate bodily use. See Graham v. Bottenfields, Inc., 176 Kan. 68, 269 P.2d 413. Finally, in the leading case of Henningsen v. Bloomfield Motors, Inc., 32 N.J. 358, 161 A.2d 69, 75 A.L.R.2d 1 (1960), the Supreme Court of New Jersey extended strict liability to cover the sale of any defective product which may be expected to cause harm to the consumer.[5] The floodgates were thus opened[6], and a surge of cases soon followed the New Jersey court's lead.[7]

The next step was to shed the warranty guise under which strict liability had been traditionally imposed and give it an honest label. This task was undertaken in 1963 by the California Supreme Court in Greenman v. Yuba Power Products, Inc., 59 Cal.2d 57, 27 Cal.Rptr. 697, 377 P.2d 897, 13 A.L.R.3d 1049. With characteristic clarity and succinctness, Justice, now Chief Justice, Traynor imposed strict liability in the name of "tort": "Although in these cases strict liability has usually been based on the theory of an express or implied warranty running from the manufacturer to the plaintiff, the abandonment of the requirement of a contract between them, the recognition that the liability is not assumed by agreement but imposed by law * * *, and the refusal to permit the manufacturer to define the scope of its own responsibility for defective products * * * make clear that the liability is not one governed by the law of contract warranties but by the law of strict liability in tort." 27 Cal.Rptr. at 701, 377 P.2d at 901.

The impact of the Greenman decision was immediate, and other courts quickly added their approval.[8] The American

---

3. E. g., Worley v. Procter & Gamble Mfg. Co., 241 Mo.App. 1114, 253 S.W.2d 532; Le Blanc v. Louisiana Coca Cola Bottling Co., 221 La. 919, 60 So.2d 873.

4. E. g., Parks v. G. C. Yost Pie Co., 93 Kan. 334, 144 P. 202, L.R.A.1915C, 179; Davis v. Van Camp Packing Co., 189 Iowa 775, 176 N.W. 382, 17 A.L.R. 649; Jacob E. Decker & Sons, Inc. v. Capps, 139 Tex. 609, 164 S.W.2d 828, 142 A.L.R. 1479.

5. Mr. Henningsen had purchased a new car, and his wife was injured while driving it when a defective steering mechanism caused the car to crash into a wall. Proceeding on a warranty theory as did the earlier cases, the court allowed Mrs. Henningsen to recover from both the manufacturer and dealer without any showing of negligence and without privity of contract. The court reasoned that the "burden of losses consequent upon use of defective articles [should be] borne by those who are in a position to either control the danger or make an equitable distribution of the losses when they occur." 161 A.2d 80–81.

6. Although the Henningsen case is recognized as the landmark decision in this area, it should be noted that prior thereto, several courts applied strict liability to products other than food or those intended for intimate bodily use. Indeed, in the 1959 decision of B. F. Goodrich Co. v. Hammond, 269 F.2d 501, Judge Phillips, speaking for the Tenth Circuit and applying the laws of Kansas and Missouri, imposed strict liability on the part of the seller to the ultimate user of an automobile tire. The basis of the decision was an implied warranty based on public policy.

7. See Prosser, The Fall of the Citadel (Strict Liability to the Consumer), 50 Minn.L.Rev. 791, 794–798 (1966), for a complete list of jurisdictions extending strict liability to manufacturers of all types of products. See also Donovan, Recent Development in Products Liability Litigation in New England: The Emerging Confrontation Between the Expanding Law of Torts and the Uniform Commercial Code, 19 Maine L.R. 181 (1967); Wade, Strict Tort Liability of Manufacturers, 19 Southwestern L.J. 5 (1964).

8. See cases collected in Annot., 13 A.L.R. 3d 1057 (1967), and the following recent cases: O. S. Stapley Co. v. Miller, 6 Ariz.App. 122, 430 P.2d 701; Bailey v. Montgomery Ward and Co., 6 Ariz.App.

Law Institute has confirmed the transition in nomenclature in its Restatement of Torts (Second), § 402A: "(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if (a) the seller is engaged in the business of selling such a product, and (b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold. (2) The rule stated in Subsection (1) applies although (a) the seller has exercised all possible care in the preparation and sale of his products, and (b) the user or consumer has not bought the product from or entered into any contractual relation with the seller." Restatement at 347, 348.

Comment m to the Restatement makes it clear that the liability stated in § 402A is strict liability based upon tort rather than warranty; that warranty has become so identified in practice with a contract of sale that the warranty theory has become something of an obstacle to the recognition of strict liability where there is no such contract; and that the rule stated in the section is not governed by the provisions of the Uniform Sales Act or those of the Uniform Commercial Code, as to warranties. See Restatement of Torts (Second), § 402A, p. 355–356.

Following our concept of Oklahoma law, in Speed Fastners, Inc. v. Newsom, 10 Cir., 382 F.2d 395, we sustained a claim for breach of implied warranty and imposed strict liability on the manufacturer of a defective product without privity. In doing so, we assumed that Okla-

homa would embrace the generally prevalent dictates of public policy in implied warranty cases. We had no occasion to consider strict liability in terms of tort, which seems to be the more rational approach to the characterization of strict liability in cases of this kind.

■ As we have seen, Schenfeld lost to the jury on negligence and to the court on implied warranty for want of a sale. Apparently the trial judge believed that Schenfeld's implied warranty action was necessarily founded upon the warranty provisions of the Colorado Uniform Sales Act [9] which are generally thought to be confined to sales situations. On appeal, Schenfeld contends, in effect, that his implied warranty action below was based upon strict liability rather than the warranty provisions of the Colorado Uniform Sales Act; that Colorado would adopt the strict liability doctrine as stated in § 402A of the Restatement of Torts (Second); and that under such theory, an initial sale of the product is no longer essential to recovery. In fairness to the trial judge it should be noted that he did not consider, and indeed was not asked to consider, the asserted claim in the light of strict liability in terms of either warranty or tort.[10] The suitor spoke in terms of negligence and implied warranty without invoking strict liability on any theory. And ordinarily a claimant cannot expect to lose in the trial court on one theory and win on appeal under another. See United States v. Gates, 10 Cir., 376 F.2d 65; Hidden Splendor Mining Co. v. General Ins. Co. of America, 10 Cir., 370 F.2d 515; First National Bank of Dodge City, Kansas v. Perschbacher, 10 Cir., 335 F.2d 442. But the rule is not inflexible and may be departed from in the in-

---

213, 431 P.2d 108; Morrow v. Caloric Appliance Corp., 372 S.W.2d 41 (Mo.); Shoshone Coca-Cola Bottling Co. v. Dolinski, 420 P.2d 855 (Nev.); Rosenau v. City of New Brunswick, 51 N.J. 130, 238 A.2d 169; McKisson v. Sales Affiliates, Inc., 416 S.W.2d 787 (Tex.); Dipangrazio v. Salamonsen, 64 Wash.2d 720, 393 P.2d 936; Hacker v. Rector, D.C., 250 F.Supp. 300.

9. Colorado Rev.Stat. § 121–1–15 (1963). The Uniform Commercial Code did not become effective in Colorado until five months after the date of the accident.

10. At the close of the evidence, and while ruling on the implied warranty claim, the trial judge observed that his decision might have been otherwise if the suit was viewed in strict liability.

terest of justice. See In Re Linda Coal and Supply Co., 3 Cir., 255 F.2d 653; Daugharty v. Gladden, 9 Cir., 257 F.2d 750. In this metamorphic state of the law of products liability, and in view of the paucity of product liability cases in Colorado, we are hesitant to foreclose a claimant's right of recovery because he failed to perceive the vogue and sweep of the law. See Lonzrick v. Republic Steel Corp., 1 Ohio App.2d 374, 205 N.E.2d 92. Cf. Keene Lumber Co. v. Leventhal, 1 Cir., 165 F.2d 815.

We do not know but surmise that Colorado will, in a proper case, embrace the concept of strict liability for all defective products, either in the name of tort or warranty.[11] The Colorado trial court is the first judge, however, of Colorado law. One judge of the federal court in Colorado, when faced with the situation, was reasonably sure that Colorado would adopt strict liability in tort as embodied in § 402A. Newton v. Admiral Corp., 280 F.Supp. 202 (D.C., Aug. 15, 1967). We think the interest of justice will be served, without prejudice to anyone, if the case is remanded to the trial court for a consideration, in the first instance, whether Colorado would embrace the concept of strict liability as stated in § 402A, and if so, whether the technicalities of a sale are essential to recovery. As to that, see Delaney v. Towmotor Corp., 2 Cir., 339 F.2d 4, 5. If, upon reconsideration, the court decides that in these circumstances Colorado would apply the strict liability theory, it then remains to be determined: (1) whether the product was, in fact, dangerously defective, and (2) if so, whether such condition proximately caused the harm complained of. See Greeno v. Clark Equipment Co., D.C., 237 F.Supp. 427.

11. Professor Prosser points out in Prosser, The Fall of the Citadel (Strict Liability to the Consumer), 50 Minn.L.R. 791, 796, that Colorado effectively joined the ranks of the states adopting the rule of strict liability when its Legislature enacted a revised § 2–318 of the Uniform Commercial Code:
"A seller's warranty whether express or implied extends to any person who

The judgment of the court, insofar as it relates to the implied warranty claim, is vacated and the case is remanded for further proceedings in accordance with the views herein expressed.

may reasonably be expected to use, consume, or be affected by the goods and who is injured by breach of the warranty. A seller may not exclude or limit the operation of this section. Colo.Rev.Stat.Ann. § 155–2–318 (1963)."