**LEO SHEEP COMPANY et al.,**
**Plaintiffs-Appellees,**

v.

**UNITED STATES of America, et al.,**
**Defendants-Appellants.**

No. 76–1138.

United States Court of Appeals,
Tenth Circuit.

Argued and Submitted Jan. 26, 1977.

Decided May 17, 1977.

Rehearing and Rehearing En Banc
Denied Feb. 28, 1978.

T. Michael Golden, Rawlins, Wyo. (John A. MacPherson of MacPherson & Golden, Rawlins, Wyo., and Davis, Graham & Stubbs, Denver, Colo., on the brief), for plaintiffs-appellees.

Peter R. Steenland, Jr., Dept. of Justice, Washington, D. C. (Peter R. Taft, Asst. Atty. Gen., Washington, D. C., James P. Castberg, U. S. Atty., Tosh Suyematsu, Asst. U. S. Atty., Cheyenne, Wyo., and Edmund B. Clark, Dept. of Justice, Washington, D. C., on the brief), for defendants-appellants.

Before McWILLIAMS, BARRETT and DOYLE, Circuit Judges.

McWILLIAMS, Circuit Judge.

Leo Sheep Company and Palm Livestock Company, both Wyoming corporations, brought suit against the United States of America, the Secretary of the Interior, and the Director of the Bureau of Land Management for declaratory and injunctive relief under the Quiet Title Act, 28 U.S.C. § 2409a. The plaintiffs, as owners of certain odd-numbered sections of land in Carbon County, Wyoming, claimed that the United States had unlawfully entered their property by clearing a pathway across certain of their section corners, which interlocked with the even-numbered sections of the public domain. By answer the United States acknowledged clearing this path, and claimed it had the legal right to do so. After stipulating to the facts, both sides moved for summary judgment. The district court ruled in favor of the plaintiffs, and the United States now appeals.

The odd-numbered sections of land here involved were granted by Congress in 1862 to the Union Pacific Railroad. Act of July 1, 1862, ch. 120, 12 Stat. 489, 492(3) and (4), *as amended*, Act of July 2, 1864, ch. 216, 13 Stat. 356, 358(4). Leo Sheep, hereinafter referred to as the plaintiff, now owns the odd-numbered sections as successor-in-title to the railroad. By virtue of leases issued under section 3 of the Taylor Grazing Act, 43 U.S.C. § 315b, plaintiff also uses the interlocking even-numbered sections of the public domain for general grazing and pasturage, and thereby has integrated its operations into an undivided unit. However, the fact that plaintiff has grazing rights in the even-numbered sections is not urged by either party as being of any particular significance, and hence for the purposes of this case, at least, the even-numbered sections may be treated as simply being part of the public domain, which indeed they are.

Under the stipulation, we are here concerned with Section 15, Township 24 North, Range 83 West, 6th P.M., which is owned by the plaintiff as successor-in-interest to the railroad. The grant by Congress to the railroad in 1862 was of the odd-numbered sections, which made for a checkerboard effect. The aforesaid Section 15 is hence surrounded on all four sides by sections of the public domain. In 1938 the Bureau of Reclamation built the Seminoe Reservoir to the west and south of Section 15. Down though the years the reservoir and adjacent area have been used for fishing and hunting. Problems have arisen concerning the ability of the public to gain access to the area. In 1965, several livestock operators established Elk Mountain Safari, Inc.,[1] which proceeded to institute a system of "access fees" which the public had to pay before they could get into the area. The Government received complaints about this practice, and attempted to negotiate with

---

1. Elk Mountain Safari, Inc. was a plaintiff in the present proceeding, but was later withdrawn from the case.

the livestock owners to secure public access to the Seminoe Reservoir area. When these negotiations failed, the Government decided to relocate and improve an existing dirt road in that area in order to provide the public access to the reservoir area from a nearby public highway. The Government's effort to establish such a road is what generated the present dispute.

Reference is now made to the appendix which is a sketch of the area in question. Section 15, as well as other odd-numbered sections, which on the sketch are shaded, are owned by the plaintiff as the successor-in-title to the railroad. As indicated, the Seminoe Reservoir lies to the west and south of Section 15. Sections 14, 22, and 16 are public domain belonging to the United States. The Hanna-Leo Road, a county road, runs more or less north and south at the eastern edge of Section 14.

In an effort to give the public access to the reservoir area, and at the same time minimize any possible trespass to plaintiff's lands, the Bureau of Land Management proposed to use a pre-existing road that ran westerly from the Hanna-Leo county road in Section 14, crossing the corner of Section 15 into Section 22, and to then relocate the road so as to run westerly across the top of Section 22, which was public domain, and then across the southwest corner of Section 15 into Section 16, again part of the public domain, and thereby gain access to the reservoir.[2]

On or about December 20, 1973, the Bureau began to blade this pre-existing road which ran from the Hanna-Leo Road, a public highway, into Section 14. In this regard, the parties stipulated as follows:

[BLM] began blading a pre-existing road starting at a county road in the south half of Section 14, Township North, Range 83 West, 6th P.M., on Bureau of Land Management lands, continuing westerly across said Section 14 and crossing the SE corner of Section 15 (fee section of Plaintiff Leo Sheep Company) approximately 30 feet from the Section corner through a pre-existing cattleguard into Bureau of Land Management Section 22, thence continuing southwesterly approximately 1000 feet where the blading operation departed the pre-existing road and resumed a westerly course marking a new route to the NW corner of Bureau of Land Management Section 22 co-terminal with the SW corner of Plaintiff Leo Sheep Company Section 15, crossing said SW corner of Section 15 approximately four feet from said section corner, into Bureau of Land Management Section 16 and thence bladed westward to the shore of Seminoe Reservoir.

As indicated above, both the plaintiff and the Government moved for summary judgment based on a stipulation as to the pertinent facts. To resolve fully what is to us a rather complex problem by summary judgment is perhaps overly ambitious. Be that as it may, the Government's primary position in the trial court, as well as in this Court, has been that in the 1862 congressional grant to the Union Pacific Railroad, the plaintiff's predecessor in title, there was an implied reservation of an easement. The trial court concluded as a matter of law that there was no such implied reservation of an easement, nor was there any common law easement by way of necessity, and on this basis entered summary judgment in favor of the plaintiff. Our study of the matter convinces us that the trial court erred in concluding that there was no implied reservation in the congressional grant of 1862.

In its grant to the railroad in 1862, Congress granted the railroad the odd-numbered sections on both sides of the proposed railroad right-of-way extending back from

2. We note, still referring to the appendix, that there apparently is another pre-existing dirt road that cuts off from the Hanna-Leo county road and runs westerly directly through Sections 14, 15, and 16 to the reservoir area. Additionally, the pre-existing dirt road, a portion of which was used by the Bureau of Land Management in the instant case, originally ran westerly through Sections 22 and 21, the latter section also being owned by the plaintiff.

the right-of-way some 10 miles. In 1864 the legislative grant was doubled to encompass lands lying within 20 miles on each side of the railroad. The even-numbered sections, which were not conveyed to the railroad, continued to be in the public domain. By granting to the railroad the odd-numbered sections, and retaining the even-numbered sections, a checkerboard effect resulted. With some exceptions, odd-numbered sections were surrounded on all four sides by even-numbered sections which were part of the public domain. Similarly, even-numbered sections owned by the Government as public land were also generally surrounded on all four sides by odd-numbered sections granted to the railroad. As a consequence, after the grant in 1862, either the Government had an implied easement to cross land granted the railroad to gain entry into an even-numbered section, or it had to get permission from the railroad to do so on the latter's terms. It is in this context that we must study the congressional grant in 1862 to the railroad of the odd-numbered sections in Carbon County, Wyoming.

■ A legislative grant of public land is a law as well as a conveyance, and such effect must be given to it as will carry out the intent of Congress. *Missouri, Kan. and Tex. Ry. v. Kansas Pac. Ry.*, 97 U.S. 491, 24 L.Ed. 1095 (1878) and *Schulenberg v. Harriman*, 88 U.S. 44, 62, 22 L.Ed. 551 (1875). Admittedly, there was no express reservation of an easement in the congressional grant of 1862 with which we are here concerned, but appellants contend that the intent of Congress was such that there was an *implied* reservation of an easement of access to the retained sections. In order to determine whether there was an implied reservation of an easement of access, we look solely to the intent of Congress, as such will not be defeated by application of the rules of common law. *Missouri, Kan. and Tex. Ry. v. Kansas Pac. Ry.*, 97 U.S. 491, 24 L.Ed. 1095 (1878).

■ Accordingly, our problem is to ascertain the intent of Congress when in 1862 it granted land in Carbon County to the railroad. The dominant intent behind the grant was not to help, as such, the railroads. The dominant intent, though not without military overtones, the Civil War being then in progress, was to "open up" the West and develop it. To settle the West, the building of railroads was essential. But to build a railroad was a costly venture, and railroad companies would not build a railroad in what was then a virtual wilderness without financial inducement. And the grant of land by the Government to the railroad was that inducement. *United States v. Union Pac. R. R.*, 91 U.S. 72, 23 L.Ed. 224 (1875).

This and other similar grants were made to give access to the unsettled territories and to encourage settlement and development of those lands. *Winona & St. P. R. R. v. Barney*, 113 U.S. 618, 5 S.Ct. 606, 28 L.Ed. 1109 (1885); *Platt v. Union Pac. R. R.*, 99 U.S. 48, 25 L.Ed. 424 (1878). It was Congress' intent that lands granted, and most certainly lands retained, would eventually be conveyed to private persons who would develop the land and, incidentally, patronize the railroad.

■ Based on the foregoing analysis, we conclude that in granting land to the Union Pacific Railroad in 1862, Congress by implication intended to reserve an easement to permit access to the even-numbered sections which were surrounded by lands granted the railroad. To hold to the contrary would be to ascribe to Congress a degree of carelessness or lack of foresight which in our view would be unwarranted. If there be no implied reservation, then the grant of the odd-numbered sections rendered inaccessible the interlocking even-numbered sections and such would have thwarted, rather than encouraged, settlement near the railroad. And if it reserved no right of access to the retained even-numbered sections, Congress not only granted the railroad the odd-numbered sections, but also granted the railroad the exclusive use of the even-numbered sections. We find

ourselves unable to conclude that such was the intent of Congress.

We believe our conclusion that there was such a congressional intent in 1862 finds support in several decisions of the Supreme Court and also by the enactment by Congress in 1885 of the so-called Unlawful Inclosures Act. 43 U.S.C. § 1061, *et seq.* That act provides, in essence, that "[N]o person, by force, threats, intimidation . . . or any other unlawful means, shall prevent or obstruct . . . free passage over or through the public lands. . . . ."

In *Camfield v. United States*, 167 U.S. 518, 17 S.Ct. 864, 42 L.Ed. 260 (1897), the Supreme Court upheld the constitutionality of the Unlawful Inclosures Act. The defendants in *Camfield* were all successors-in-interest to land granted the Union Pacific Railroad, and thus in a comparatively large area, including many townships, the defendants owned the odd-numbered sections, with the Government retaining the even-numbered sections as part of the public domain. The defendants had constructed fences a few feet back from the township line in all odd-numbered sections. And in the four surrounding townships, again in the odd-numbered sections, they had constructed fences a few feet back from the township line. The net effect was that a given township could be completely fenced in.

It was in this setting that the United States brought a suit in equity under the Unlawful Inclosures Act to compel the removal and abatement of fences maintained by the several defendants which had in this manner enclosed some 20,000 acres of public lands. The defense raised was that in each instance the fences had been built on land owned by the defendants and acquired from the railroad and its successors-in-interest. The Supreme Court rejected this defense and upheld the statute under the police power of the state. In thus holding, the Supreme Court commented upon the nature of the grant to the railroad as follows:

We are not convinced by the argument of counsel for the railway company, who was permitted to file a brief in this case, that the fact that a fence built in the manner indicated will operate incidentally or indirectly to enclose public lands, is a necessary result, which Congress must have foreseen when it made the grants, of the policy of granting odd sections and retaining the even ones as public lands; and that if such a result inures to the damage of the United States it must be ascribed to their improvidence and carelessness in so surveying and laying off the public lands, that the portion sold and granted by the Government cannot be enclosed by the purchasers without embracing also in such enclosure the alternate sections reserved by the United States. Carried to its logical conclusion, the inference is that, because Congress chose to aid in the construction of these railroads by donating to them all the odd-numbered sections within certain limits, it thereby intended incidentally to grant them the use for an indefinite time of all the even-numbered sections. It seems but an ill return for the generosity of the Government in granting these roads half its lands to claim that it thereby incidentally granted them the benefit of the whole.

Another Supreme Court decision which sheds light on our present problem is *Buford v. Houtz*, 133 U.S. 320, 10 S.Ct. 305, 33 L.Ed. 618 (1890). The plaintiffs in *Buford* were cattlemen who owned the odd-numbered sections in a vast tract of land in Utah as successors in interest to the Central Pacific Railroad Company, the latter having itself acquired the land by grant of Congress. The even-numbered sections in the tract were owned by the United States, and the defendant sheepmen had been accustomed to grazing their sheep on these public lands. In so doing, however, the sheep trespassed upon the plaintiffs' lands.

In this setting the plaintiffs in *Buford* brought a bill in equity against the sheepmen, asserting, among other things, that the sheepmen had no "right of way for any of his or their sheep over said lands of

plaintiffs, or any part thereof, except over and along the highways aforesaid . . ." and seeking an injunction. The district court for the then Territory of Utah dismissed the bill for lack of equity. On appeal the Supreme Court for the Territory of Utah affirmed, and the United States Supreme Court in turn affirmed the territorial Supreme Court. In so doing the United States Supreme Court stated that growing out of the custom of nearly a hundred years the defendant sheepmen had an "implied license" to graze their sheep on the public domain. The Court rejected the contention of the plaintiff cattlemen that the sheepmen should not be permitted to use the public land because in so doing, "their cattle trespass upon the unenclosed lands of plaintiffs." So in *Buford* the Supreme Court held that sheepmen who trailed their sheep across plaintiffs' land in order to get to the public domain were not subject to an injunction. The Court, in balancing the equities, noted that to hold to the contrary would mean that the plaintiff cattlemen, owning approximately 350,000 acres scattered in checkerboard fashion through a large tract consisting of some 921,000 acres, could "exclude" the defendant sheepmen from the whole tract and in effect obtain for themselves a "monopoly" of the entire tract. The Court observed that it was not able to observe any equity in such a result.

A case arising out of Utah, when that state was a part of the Eighth Circuit, has bearing on the present dispute. *Mackay v. Uinta Development Co.*, 219 F. 116 (8th Cir. 1914), involved a dispute between rival groups of sheepmen. Uinta Development Company owned the odd-numbered sections in a large tract of land, having acquired these odd-numbered sections from successors in interest to the Union Pacific Railroad, who in turn had acquired the land by act of Congress. The even-numbered sections remained unoccupied public domain. Mackay on occasion drove his sheep across portions of the land owned by the Uinta Development Company, in getting between his summer and winter ranges. Uinta served notice on Mackay to stay off the odd-numbered sections owned by Uinta. Mackay refused and at the company's instance was arrested for trespass.

Uinta then brought suit against Mackay for damages resulting from Mackay's trailing his sheep across Uinta's land. Mackay counterclaimed for damages resulting from Uinta's wrongful obstruction of his passage and from his arrest and criminal prosecution for trespassing. Upon trial, judgment entered for Uinta and Mackay appealed.

At trial Mackay asked the court for the following declaration of law:

[T]hat, if it found from the evidence that the company was in the rightful possession of the odd-numbered sections and did not designate a course for him to follow, then as a licensee of the government he was entitled to select a reasonable way over which to trail his sheep, and if it further found that the way he selected was a reasonable one, and was used for the purpose of driving his sheep to and upon the public domain, then as a matter of law, he would not be liable in damages for crossing the company's sections.

The trial court refused the request for such a declaration. However, on appeal, the Eighth Circuit Court held that the requested declaration was a correct statement of the law. In reversing the trial court the Eighth Circuit, applying a balancing test of its own, stated the problem as follows:

Mackay claimed the right to trail his sheep over the even-numbered sections of the public domain and to do what else was necessary to secure it without subjecting himself to a charge of trespass. The company admitted his right as to the public domain, but warned him not to go over any of its lands on penalty of prosecution for trespass. The odd-numbered sections touch at their corners and their points of contact, like a point in mathematics, are without length or width. If the position of the company were sustained, a barrier embracing many thousand acres of public lands would be raised, unsurmountable except upon

terms prescribed by it. Not even a solitary horseman could pick his way across without trespassing. In such a situation the law fixes the relative rights and responsibilities of the parties. It does not leave them to the determination of either party. As long as the present policy of the government continues, *all persons as its licensees have an equal right of use of the public domain, which cannot be denied by interlocking lands held in private ownership.* (Emphasis added.)

The cases above referred to indicate to us a judicial recognition that Congress, by its 1862 grant to the railroad of the odd-numbered sections, did by implication intend to reserve a right of access to the interlocking even-numbered sections *not* conveyed to the railroad. While none of the above cases uses the term "implied reservation," all recognize the right of the Government and the public to have access to the public domain, and each holds that this right cannot be denied by the fact that the interlocking odd-numbered sections are privately owned. Also, as earlier mentioned, we believe that the Unlawful Inclosures Act, when applied to a checkerboard railroad grant, is itself evidence of congressional recognition in 1885 that there was such an implied reservation in the 1862 railroad grant.

■ The patent on Section 15, which section is apparently by stipulation serving as an exemplar, did not issue until around 1900, and the patent as issued by the Secretary contained no express reservation of any right of entry. In this regard, the trial court concluded that "the failure of the Secretary to include an express reservation in the patent precludes the Government from subsequently asserting the existence of such limitation [presumably by implication] . . . ." With this we do not agree.

■ The district court correctly noted that only Congress can condition or limit a title conveyed by patent, and the Secretary of the Interior, as an agent of the Congress, can reserve only what Congress authorizes

him to reserve. *Shaw v. Kellogg*, 170 U.S. 312, 337–38, 18 S.Ct. 632, 42 L.Ed. 1050 (1898); *Deffeback v. Hawke*, 115 U.S. 392, 406, 6 S.Ct. 95, 29 L.Ed. 423 (1885). The inverse of this, however, is also true: A patent cannot convey what has been reserved by law. *Swendig v. Washington Water Power Co.*, 265 U.S. 322, 44 S.Ct. 496, 68 L.Ed. 1036 (1924); *United States v. Washington*, 233 F.2d 811 (9th Cir. 1956). The congressional grant in 1862 itself acted as a transfer, and operates *in praesenti. Schulenberg v. Harriman*, 88 U.S. 44, 22 L.Ed. 551 (1874). The real issue is whether there was an implied reservation in the congressional grant of 1862. We have now held that there was. The absence of an express reservation in the patent did not negative the implied reservation in the earlier grant. A patent is merely evidence of a grant, and the issuing officer acts ministerially, not judicially. *United States v. Stone*, 69 U.S. 525, 535, 17 L.Ed. 765 (1864); *United States v. Washington*, 233 F.2d 811 (9th Cir. 1956).

Whether this entire controversy can ultimately be resolved on a summary judgment basis, we do not know. We do know, for example, that the trial court, having concluded that there was no implied reservation, found it unnecessary to consider whether there was any necessity for the preparation and filing of an Environmental Impact Statement. Other issues may also remain. Be that as it may, at the heart of the trial court's ruling was its conclusion that in the congressional grant of 1862 there was no implied reservation. Having satisfied ourselves that in thus holding the trial court misjudged the intent of Congress, the judgment must be reversed and the cause remanded with directions that the trial court take up at that point. The trial court should proceed on the premise that there was an implied reservation of an easement in the congressional grant in 1862 of the odd-numbered sections in Carbon County, Wyoming to the Union Pacific Railroad.

Judgment reversed.

Appendix to follow.

APPENDIX

Area Near Seminoe Dam, Carbon County, Wyoming

Odd-numbered sections granted to rail-road in 1862 and now owned by plaintiff

Even-numbered sections of public domain

Pre-existing dirt road

Pre-existing dirt road improved by B.L.M. December 1973

Dirt road relocated by B.L.M. December 1973

BARRETT, Circuit Judge, dissenting:

I respectfully dissent. Significantly, the United States did not believe for the past 110 years that it was endowed with the gratuities found in the majority opinion. This is evidenced in the uncontroverted finding of the District Court which goes far to prove the correctness of the decision we reverse: "For 110 years after the grant of the fee lands to the Union Pacific Railroad Company, neither the Department of the Interior nor any other agency or agent of the United States construed the grant or the patents issued pursuant thereto as conferring any right upon the United States, its agents or the public to traverse the lands granted to the railroad, and such administrative construction should be given great weight in the event of doubt concerning the scope of the grant."

It is fundamental that a grant is to be construed strictly against the grantor. Congress did not expressly reserve easements in the grants or patents issued pursuant thereto to reach the even-numbered sections. Such failure precludes judicial legislation. No statutory authorities or common law principles are cited which confer upon the United States the special privilege granted here.

The discussion relative to the Unlawful Inclosures Act, combined with the *Camfield* and *Buford* decisions, lends no credence to the majority's holding that ". . . when applied to a checkerboard railroad grant, is . . . evidence of congressional recognition in 1885 that there was such an implied reservation in the 1862 railroad grant."

The majority opinion does not, in my view, stress the fact that Leo Sheep Company *is not* challenging the right of the United States to obtain the right-of-way across its private land. What the case is all about is whether the United States may *take the private land for access purposes without compensation.* This point is not recognized in the majority opinion. In fact, the observation is made that without the aid of the implied reservation, the grant of the odd-numbered sections defeated access to the interlocking even-numbered sections.

It is uncontroverted that Leo Sheep Company must employ the condemnation statutes in order to obtain a right-of-way easement over and across the lands of another. Our holding here is that the United States—on the basis of an implied reservation—is a "favored person." In my view the United States is in no better position than Leo Sheep Company. By imposing the public servitude, i. e., the "implied reservation" to use the privately owned lands acquired via the railroad grants for right-of-way easement purposes without the payment of any compensation, we have, I believe, permitted the United States to take private property without compensation in violation of rights guaranteed Leo Sheep Company by the Fifth Amendment to the Constitution.

I would affirm the District Court's judgment, findings and conclusions.

## OPINION ON PETITION FOR REHEARING

The appellees seek a rehearing of the case and ask that such rehearing be en banc. As grounds therefor the appellees urge the following: (1) This Court in its opinion assumed substantive facts outside the record; (2) this Court decided the case on an issue which was not presented to or decided by the trial court, i.e., whether Congress intended to and, by implication, did reserve an easement in the 1862 Union Pacific Railroad Grant Act; (3) the issue of congressional intent in the 1862 Union Pacific Railroad Grant Act is an issue of fact which should first be determined by the trial court, after both sides are given the opportunity to present evidentiary matter; and (4) this Court erred in its legal conclusion that there was an implied reservation in the 1862 Union Pacific Railroad Grant Act. We deem none of these matters to warrant a rehearing, and accordingly the petition for rehearing is denied. We shall briefly discuss each of the matters thus urged.

I.

Counsel takes umbrage at the reference in our opinion to Elk Mountain Safari, Inc. and its operations starting in 1965 and asserts that there is no reference to such in the stipulation of facts presented to the trial court. Such is true, though the information concerning Elk Mountain Safari, Inc. is obviously a part of the overall record now before us. Be that as it may, our opinion does not turn on the operations of Elk Mountain Safari, Inc. So, whether the background information concerning Elk Mountain Safari, Inc. was technically before the trial court is really of little moment. The real and only issue resolved by our opinion concerns congressional intent in 1862, not what Elk Mountain Safari, Inc. did in 1965. A factual statement in an appellate court's opinion which finds no support in the record is not grounds for a rehearing where the statement is in no way

related to the basis of the decision. *United States v. Gorham,* 175 U.S.App.D.C. 383, 536 F.2d 410 (1976).

## II.

In our opinion we stated that the Government's primary position both in this Court as well as in the trial court has been that in the 1862 congressional grant to the Union Pacific Railroad there was an implied reservation of an easement. That statement is not entirely correct. It is true that in this Court the Government did primarily rely on the theory of an implied reservation in the 1862 grant to the Union Pacific Railroad. We stand corrected, and concede that in the trial court the Government did not rely on such a theory. On the contrary it was the appellees who themselves injected the matter into the case, and sought from the trial court a ruling that there was *no* implied reservation in the 1862 congressional grant.

In its pretrial memorandum the appellees framed one of the issues to be resolved as follows:

2. Whether United States was authorized to, and did in fact, reserve rights of way across Union Pacific lands for general public access to alternate public domain sections.

The stipulation of facts was couched in more general terms and listed as the first "legal issue" to be decided whether there was an "implied easement across fee lands for reasonable access to public recreation areas." In its proposed findings and conclusions the appellees stated that one issue to be resolved as a "matter of law" was "[w]hether the United States reserved easements on behalf of the public in the patents to the fee lands issued to plaintiffs' predecessors pursuant to the Union Pacific Railroad Grant Act of 1862."

The trial court thereafter made the following conclusion of law:

6. Accordingly, this Court concludes that the United States has not reserved or received by grant, expressly or by implication, and does not now have, any right, by easement or otherwise, in the lands of plaintiffs for access to the east bank of Seminoe Reservoir, or for construction of public roads across the lands of plaintiffs for access to said reservoir and lands, and absent condemnation proceedings and payment of just compensation is without authority to construct such road.

■■■■ Based on the foregoing, and particularly, of course, based on the conclusions of the trial court itself, we conclude that the question of whether there was an implied reservation was in the case at the trial court level. We will concede that the theory advanced by the Government in this Court in support of its implied reservation argument was not presented to the trial court.* Ordinarily a party may not lose in the trial court on one theory, and later win on appeal under another theory. But the rule is not inflexible and there are exceptions. *Schenfeld v. Norton Co.,* 391 F.2d 420 (10th Cir. 1968). We are of the view that the instant case comes within the exception to the general rule, and that the question of congressional intendment in 1862 is a theory that can be raised on appeal, though it was not specifically raised in the trial court.

It is of more than passing interest to note that the appellees in their written brief filed with this court addressed the question of whether there was an express or implied reservation in the Union Pacific Railroad Grant Act of 1862 on its merits, and the suggestion that the matter should not have been considered by this Court because it was never before the trial court is first advanced in appellees' petition for rehearing.

## III.

■■■ Appellees assert that the matter of an implied reservation in the congressional grant of 1862 is a question of fact, and that the matter should be remanded to the trial court to conduct an evidentiary hearing

---

* Perhaps the shift in legal theory between the trial court and this Court stems from the fact that apparently the Government had different counsel here than in the trial court.

thereon and then make its own conclusion, subject to appellate review. In appellees' pretrial memorandum, the stipulation, appellees' proposed findings and conclusions, and the trial court's own conclusions, it would appear that all concerned were of the view that the issue of implied reservation posed an issue of law. And that is our view too.

Again it is of interest to note that the suggestion that this case should be remanded for an evidentiary hearing on congressional intent was not made until the petition for rehearing was filed. In its brief appellees made no such suggestion. Apparently they were perfectly welcome to submit the matter to this Court as involving a question of law. Only when they suffered an adverse ruling did the appellees suddenly claim that this was an issue of fact that required an evidentiary hearing.

## IV.

The real issue in the petition for rehearing is whether this Court is correct in its conclusion as to congressional intent in the 1862 Union Pacific Railroad Grant Act. We agree that this is a difficult problem and not one which is free from all doubt. However, in this connection, the petition for rehearing is simply a reargument of the matter. In spite of appellees' dire predictions concerning the consequences of our opinion, should it be allowed to stand, we remain convinced that ours is the proper disposition of the matter. To hold to the contrary would in our view ignore the teaching of *Camfield v. United States,* 167 U.S. 518, 17 S.Ct. 864, 42 L.Ed. 260 (1896) and *Buford v. Houtz,* 133 U.S. 320, 10 S.Ct. 305, 33 L.Ed. 618 (1890) and would be at odds with *Mackay v. Uinta Development Co.,* 219 F. 116 (8th Cir. 1914).

Petition for rehearing is denied, with Judges McWilliams and Doyle, to whom the case was argued and submitted, voting to deny rehearing, and Judge Barrett, also on the hearing panel and who dissented in the opinion filed May 17, 1977, voting to grant rehearing.

Judge Barrett having requested a vote of the active court on the suggestion for rehearing *en banc* pursuant to Fed.R.App. P. 35, rehearing *en banc* is denied, with Judges Holloway, McWilliams, Doyle, and Logan voting to deny rehearing *en banc,* and Judges Seth, Barrett, and McKay voting to grant rehearing *en banc.*